**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Walter MOLLIER, Defendant-Appellant.**

**No. 87–1583.**

United States Court of Appeals,
Fifth Circuit.

Aug. 18, 1988.
Rehearing Denied Sept. 16, 1988.

Michael R. Gibson, El Paso, Tex. (court appointed), for defendant-appellant.

LeRoy Morgan Jahn, San Antonio, Tex., Joseph W. Galenski, Asst. U.S. Attys., El Paso, Tex., for plaintiff-appellee.

Before GEE, DAVIS, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Appellant Mollier challenges his conviction on counts of conspiring to import and to possess large quantities of marijuana with intent to distribute. Mollier asserts that the evidence was insufficient to sustain the jury's verdict, that the trial court erred in refusing his instruction on the definition of the word "knowingly," and that he was denied due process when the government was permitted to introduce evidence relating to certain substantive counts that should have been barred under the doctrine of non-mutual collateral estoppel. Finding no error, we affirm.

## I.

The government indicted appellant Mollier along with 29 others for a large drug conspiracy and related crimes. Mollier was charged in Count 2 with conspiring to import in excess of 1,000 pounds of marijuana,[1] in Count 3 with conspiring to possess in excess of 50 kilos of marijuana with intent to distribute,[2] in Count 26 with aiding and abetting a co-defendant in exporting speech scramblers without an export license,[3] and in Counts 27 and 28 with aiding and abetting several co-defendants in the investment of proceeds derived from an illegal drug operation.[4]

Mollier was formerly an El Paso police officer who had once arrested the kingpin of the charged drug conspiracy, Gilberto Ontiveros, in June 1979 for drug violations. In the arrest report, Mollier attributed Ontiveros with coordinating the importation of 1,425 pounds of marijuana which Mollier himself had seized from a van shortly before the arrest. Mollier also noted that "Ontiveros' organization is purported to transact in multi-ton quantities of marijuana with unknown sources of supply in Mexico."

An informant who testified at Mollier's trial, Carlos de Herrera, revealed the extent of Ontiveros' organization. From two palatial residences in Juarez, Mexico, Ontiveros directed the planting and harvesting of marijuana on plantations in Mexico's interior, transportation of the crop to storage facilities in the United States, and distribution in large quantities to American middlemen. De Herrera testified that in late 1985, he located one of the Ontiveros plantations—the so-called Tres Riitos ranch—for DEA agents. Tres Riitos was located in the Casas Grandes area of the state of Chihuahua, Mexico, an approximate eleven-hour drive from Juarez, which is at the El Paso border.

Using map coordinates given by de Herrera, the agents orchestrated a raid on Tres Riitos with cooperation from the Mexican government. Although temporarily abandoned, the ranch was found to have between 20 and 30 cultivated marijuana fields and to employ an estimated 150 to 200 workers. Tres Riitos was equipped with a landing strip, a ranch house, living quarters for the workers, and irrigation facilities. Once there, the agents eradicated a quantity of marijuana which, if harvested and cured, would have weighed as much as 125 tons and carried an estimated street value of over $75,000,000.

In addition to marijuana cultivation, Ontiveros was engaged in certain "legitimate" front operations. For at least one year prior to Mollier's arrest in December 1986, Ontiveros actively supervised construction of the Palacio del Cesar luxury hotel in Juarez. Testimony given by one of the gang members established that monies used to finance construction of the hotel had been derived from the sale of illegal substances.

---

**1.** 21 U.S.C. §§ 952(a), 960(a)(1).

**2.** *Id.* §§ 841(a)(1), 846.

**3.** 22 U.S.C. § 2778; 18 U.S.C. § 2.

**4.** 21 U.S.C. § 854.

The precise time frame in which Mollier became reacquainted with Ontiveros does not appear of record. We are informed that at some time after their first meeting, Mollier resigned from the El Paso Police Department and opened a private investigative firm with his live-in girlfriend, Elva Lovato. During 1983 and 1984, the firm struggled, and Mollier claimed a total of $502 in taxable income. For 1985, however, the firm showed a net profit of $120,983. How was this money made?

By June 1984, Mollier was working as an electronics broker for Ontiveros, buying cellular and portable phones and portable radios and base stations for Ontiveros' homes in Juarez and his marijuana plantations in Chihuahua and Sinaloa. Mollier purchased these items from an American supplier, representing his client to be a very wealthy rancher with connections to the President of Mexico and other high-ranking officials in the Mexican government.

In the summer of 1985, the first system was replaced with a more powerful system that had been designed, at Mollier's instructions, to allow direct radio contact between Juarez and the Tres Riitos plantation. For this purpose, Mollier purchased two solar-powered radio repeater stations that had the capability of relaying radio signals from the top of the Bola mountains, near Juarez, to a station midway between Juarez and the plantation, and finally from the midpoint to the plantation itself. To mask conversations from radio eavesdroppers, Mollier procured scrambling devices for the radios. Other electronics purchases included closed-circuit television security systems installed in Ontiveros' homes, bugging devices, and stun guns.

Mollier kept large amounts ($50,000 to $75,000) of cash in his office and paid for the electronics equipment in bills of small denominations. The government also introduced evidence that Mollier helped Ontiveros outfit the new hotel with such luxury items as a grand piano, lacquered Italian furniture, gym equipment, televisions, and refrigerators, all paid for in cash. In sum, the government showed that Mollier spent at least $150,000 in cash on behalf of Ontiveros.

When preparing Mollier's 1985 tax estimate, his accountant noticed that Mollier had received $350,000 in cash in a single transaction in Mexico. The accountant asked Mollier if he had filed a Customs declaration of the cash he brought into the United States; Mollier said no. The accountant wanted Mollier to deposit all cash receipts in the bank for traceability; Mollier refused, telling the accountant that his "client" preferred that he not deposit the funds in a bank. Mollier fired this accountant soon thereafter.

Mollier's investigative firm provided Ontiveros with services even more nefarious, although Mollier's personal role in them is somewhat questionable. On one occasion Mollier's partner, Elva Lovato, helped some members of the conspiracy in an unsuccessful attempt to kidnap a former member of the gang. An informant who testified about the bungled kidnapping understood from statements made by Ontiveros that Mollier's firm was being paid $5,000 per day to surveil the victim. On another occasion, Ontiveros called Lovato on a mobile phone to instruct her to locate the home of a person suspected by the gang of stealing 2,000 pounds of marijuana from one of Ontiveros' El Paso warehouses. Lovato complied by carrying out the search.

After his arrest, Mollier and one other co-defendant obtained a severance from the main conspiracy trial, which preceded theirs. At the close of the evidence in Mollier's case, the district court granted his motion to acquit on Counts 26, 27, and 28, but submitted the drug conspiracy counts to the jury. During deliberation, the jury asked for further instruction on what the defendant must have known about the conspirators that he dealt with; in response, the trial judge redirected the jury to their written instructions. The jury then returned a guilty verdict. Mollier appeals.

## II.

### A. *Sufficiency of the Evidence.*

■ In assessing a challenge to the sufficiency of the evidence to support a convic-

tion, we view the evidence in the light most favorable to the government and determine "whether any rational trier of fact could have found the essential elements of the crime beyond reasonable doubt." *United States v. Hernandez–Palacios*, 838 F.2d 1346, 1348 (5th Cir.1988) (citing *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). In drug conspiracy cases, the government must prove the existence of an agreement to do an unlawful act and the defendant's knowledge and voluntary participation in the conspiracy. *United States v. Palella*, 846 F.2d 977, 981 (5th Cir.1988); *United States v. Williams–Hendricks*, 805 F.2d 496, 502 (5th Cir.1986).

■ It is unnecessary in drug conspiracy cases to prove an overt act in furtherance of the conspiracy. *Williams-Hendricks, supra.* Further, the government need not prove the existence of a formal agreement to commit an unlawful act, as the agreement itself may be tacit or silent. *Id.* Finally, "[b]oth the fact of the conspiracy and a defendant's participation in it may be proved by circumstantial evidence." *United States v. Duvall*, 846 F.2d 966, 975 (5th Cir.1988) (quoting *United States v. Cook*, 793 F.2d 734, 736 (5th Cir.1986)).

■ In contending that the evidence was insufficient to support his convictions, Mollier relies heavily upon two Supreme Court cases: *Direct Sales Co. v. United States*, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943), and *United States v. Falcone*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). In *Falcone*, the government petitioned for reversal of a decision of the Second Circuit holding that food distributors who sold sugar, beets, and yeast to illegal distillers of alcohol were not guilty of conspiracy to violate the revenue laws. On certiorari, the government conceded that there was not enough evidence of an agreement between the sellers and buyers, but it argued that the sellers could be found guilty of

conspiracy if they knew that the items they sold would benefit a conspiracy between the buyers and others. The Supreme Court appeared skeptical of the government's contention; it assumed without deciding, however, that sales to a conspirator with knowledge of the conspiracy would make the seller a co-conspirator or an aider and abetter of the conspiracy (which the Court took to be the same thing). Given this assumption, the Court held that there was insufficient evidence to support that view of the case. It therefore affirmed the Second Circuit's decision reversing the convictions.

In *Direct Sales*, the Court later confronted a mail-order drug business that had sold large quantities[5] of narcotics to a small-town doctor for several years, even after warnings from federal authorities that many of its customers were violating federal law by dispensing drugs illegally. The Court pointed out that *Falcone* had not held that a seller can never conspire with a buyer unless it knows of some other conspiracy of which the buyer is a part; instead, the *Falcone* Court merely had accepted the government's concession that the facts of that case did not support the inference that there was a conspiracy between the buyer and seller. The remainder of the *Direct Sales* opinion is devoted to showing that the conventional rules of conspiracy can apply to the seller and buyer of any item, and that the sale of controlled substances in that case only made easier the inference of both knowledge of the illegal use and *agreement* to further the illegal activity.

The basic question remains the same: Did the defendant agree to participate in the venture? The Court noted that the stronger the evidence of knowledge on the part of the seller that the buyer was acting illegally, the stronger the inference of the seller's intent to join in. *Direct Sales*, 319 U.S. at 711–12, 63 S.Ct. at 1269–70. The Court noted:

> by the defendant to its co-defendant doctor reached levels of 5,000 to 6,000 half-grain tablets per month.

---

**5.** The evidence showed that the average amount of morphine sulphate used by physicians was about 400 quarter-grain tablets per year. Sales

The step from knowledge [that the buyer was using the item for illegal purposes] to intent and agreement may be taken. There is more than suspicion, more than knowledge, acquiescence, carelessness, indifference, lack of concern. There is informed and interested cooperation, stimulation, instigation. And there is also a 'stake in the venture' which, even if it may not be essential, is not irrelevant to the question of conspiracy.

*Id.* at 713, 63 S.Ct. at 1270. We later elucidated this point in *United States v. Michelena-Orovio,* 719 F.2d 738 (5th Cir. 1983) (en banc), *cert. denied,* 465 U.S. 1104, 104 S.Ct. 1605, 80 L.Ed.2d 135 (1984), where we taught that

> *Falcone* and *Direct Sales* must be viewed along a continuum of sales of goods to persons engaged in an unlawful conspiracy. At one end of the continuum is *Falcone,* which did not involve an inherently illegal transaction at all, but rather the sale of goods "in themselves innocent." 311 U.S. at 207, 61 S.Ct. at 205 (quoting the opinion below, 109 F.2d 579, 581 (2d Cir.1940)). The sale of morphine in *Direct Sales* fell somewhere in the middle of the continuum, in that it involved the sale of a restricted commodity. Thus, "not every instance of sale of restricted goods" would support a charge of conspiracy. 319 U.S. at 712 [63 S.Ct. at 1269].... [Nonetheless i]n the case of *Direct Sales,* the sale of large quantities of morphine, together with the prolonged cooperation between the seller and buyer, provided the evidence sufficient to convict the seller of conspiracy to violate the narcotics laws.

*Michelena–Orovio,* 719 F.2d at 750–51 (footnote omitted).

In the instant case, the evidence that Mollier *knew* of Ontiveros' continuing drug conspiracy is strong; the only question is whether the jury could legitimately infer from that knowledge and from Mollier's helpful activities an *agreement* on his part to import and possess marijuana. In the words of *Direct Sales,* was Mollier supplying electronics and other items to Ontiveros with "knowledge, [but] acquiescence, carelessness, indifference, lack of concern" for

the drug business that he was aiding? Or did Mollier help Ontiveros with "informed and interested cooperation, stimulation, [and] instigation" in the drug conspiracy?

Mollier would have us place his activities at the *Falcone* end of the spectrum: The articles he procured for the ring were capable of legitimate purposes and, thus, were in themselves innocent. He further argues that his association with Elva Lovato should not implicate him in services she performed for Ontiveros. We, however, have little difficulty in concluding that the jury could find Mollier guilty on sufficient evidence.

Mollier's role in the Ontiveros organization was more that of a trusted aide and lieutenant than a disinterested broker of hardware. Mollier was entrusted with vast sums of cash (apparently far more than brokering radios would require), and he fired an accountant who, disturbed by the number of small bills that were never deposited in a bank account, suggested that he use more legitimate financial techniques. Since Ontiveros himself was a fugitive from criminal justice and thus could not have made these purchases in the United States without his assets being subject to seizure, Mollier provided the organization this valuable service, giving him a stake in its venture.

Moreover, the goods he procured for Ontiveros were, in some respects, not so innocuous as Mollier characterizes them. Federal law prohibits the exportation of speech scramblers without an export license because of their obvious paramilitary capabilities; and even though Mollier may point to the absence of testimony that he had a hand in carrying them across the border, the jury was free to infer, from the fact of his brokering in these goods for the gang, that he had tacitly agreed to further its illicit goals.

The evidence is strong that Mollier knew the speech scramblers were destined for installation in the communication system which he himself had procured for the purpose of linking Ontiveros' Juarez headquarters with the marijuana plantations

and with truck caravans carrying the crop to destinations across the border. Just as in *Direct Sales,* the supplying of a restricted commodity, coupled with prolonged cooperation between the supplier and end-user, provides evidence sufficient to convict the supplier of conspiracy to violate the narcotics laws. *See Michelena-Orovio,* 719 F.2d at 751.[6]

Finally, even though the evidence tying Mollier to the Ontiveros organization is sufficient without considering Lovato's services on behalf of the investigative firm, the jury could legitimately consider these services as probative of Mollier's knowledge of the conspiracy's objectives. *Id.* at 743. To be sure, we have held that where the only circumstantial evidence is based upon the existence of a family relationship or "mere knowing" presence, a conspiracy conviction cannot be upheld. *See United States v. White,* 569 F.2d 263, 268 (5th Cir.), *cert. denied,* 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978); *United States v. Robertson,* 659 F.2d 652, 656 (5th Cir. Unit A Oct. 1981). However, when inferences drawn from a family relationship—or in this case, a quasi-family relationship—are combined with other circumstantial evidence, there may be sufficient evidence to support a conspiracy conviction. *Williams-Hendricks,* 805 F.2d at 503. And as we have pointed out, the record in this case indicates that there is other circumstantial evidence that amply supports Mollier's conspiracy conviction.

### B. *The Refusal To Instruct.*

■ Mollier argues that the district court committed reversible error by refusing his instruction on the definition of the word "knowingly." The court did charge the jury with the following instruction:

> The word knowingly as that term is used in these instructions means that the act was done voluntarily and intentionally and not because of mistake or accident.

To this instruction, Mollier's attorney proposed the following addition:

> [and f]urther with awareness on the part of the Defendant that those with whom he dealt were engaged in illegal activity and the Defendant would necessarily have to be aware ... that the items he sold were to be used for an illegal purpose by the recipients.

The issue we must decide is whether the district court abused its discretion by refusing Mollier's proposed jury instruction in this case. *See Duvall,* 846 F.2d at 971; *United States v. Rubio,* 834 F.2d 442, 450 (5th Cir.1987). In reviewing the district court's decision, we afford the trial judge " 'substantial latitude in tailoring his instructions as long as they fairly and adequately cover the issues presented by the case.' " *United States v. Kimmel,* 777 F.2d 290, 293 (5th Cir.1985) (quoting *United States v. Pool,* 660 F.2d 547, 558 (5th Cir. Unit B Nov. 1981)). Accordingly, we have adopted the following rule:

> A trial judge's refusal to deliver a requested instruction constitutes reversible error if, but only if, the instruction (1) is substantively correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense.

*United States v. Grissom,* 645 F.2d 461, 464 (5th Cir. Unit A May 1981). *See Rubio,* 834 F.2d at 447; *U.S. v. Hunt,* 794 F.2d 1095, 1097 (5th Cir.1986). In short, we may not overturn Mollier's conviction on the ground that the district court omitted his instruction from its jury charge unless "that instruction is legally correct, represents a theory of defense with basis in the record which would lead to acquittal, and ... that theory is not effectively presented elsewhere in the charge." *Rubio,* 834 F.2d at 447.

---

**6.** Sometimes, of course, the circumstantial evidence of a defendant's agreement to further a criminal scheme will be strong enough to support a conviction, even though the defendant's role in facilitating the substantive crime is only to procure an unrestricted commodity on a one-time basis. *See, e.g., United States v. Kendall,* 766 F.2d 1426, 1531–33 (10th Cir.1985) (airplane); *United States v. Vaughn,* 797 F.2d 1485, 1492 (9th Cir.1986) (same).

Mindful of these principles, we conclude that Mollier's proffered instruction was properly refused. First, it is not a definition of "knowingly" at all, but rather is a statement of the Mollier's theory of what the government was required to show in order to prove a conspiracy. Second, it is a flatly incorrect statement of the law of conspiracy, and in fact is much more favorable to the government than the conspiracy instruction that was actually given.

That instruction properly stated that "A conspiracy is a combination or agreement of two or more persons *to join together* in an attempt to accomplish some unlawful purpose," and correctly emphasized that conspiracy could be found only if "two or more persons in some way or manner, positively or tacitly, came to a *mutual understanding* to try to accomplish a *common and unlawful plan.*" (Emphasis added.) Mollier's proffered instruction lacks any requirement of mutual agreement; it would allow conviction based upon a determination that he had knowledge of the drug conspiracy and knowledge that the items he supplied would be used illegally, even though he did not intend to join the conspiracy.

### C. Collateral Estoppel/Evidence/Due Process.

Mollier's live-in girlfriend, Elva Lovato, was tried on Counts 26 (unlicensed exportation of speech scramblers), and 27 and 28 (investment of proceeds from illegal narcotics sales), a month before Mollier's trial. The same federal prosecutor had presented that case, and the same district judge had granted a motion for acquittal on those counts in favor of Lovato. Mollier argues that it was therefore impermissible for the government (and the judge) to proceed with his case when similar evidence on the same charges had been found legally insufficient to convict a co-defendant. Mollier cites no legal authority, but contends his right to "substantive due process" was violated by allowing the government to "prejudice" him by going forward with charges known to be legally insufficient.

The government treats this argument as a collateral estoppel argument, and to some extent this characterization seems correct. But appellant was acquitted on the counts on which he claims the government was collaterally estopped. His real argument, therefore, is that the government improperly brought in evidence on the estopped counts that "prejudiced" the jury and made his trial unfair. His argument appears to be one part collateral estoppel, one part evidence law, and perhaps one part due process.

■ We thus begin our analysis with a determination of whether non-mutual collateral estoppel—a civil doctrine—can be imported into criminal jurisprudence.[7] The government responds initially by citing *Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980). In that case, the Supreme Court held the civil rule of non-mutual collateral estoppel could not be used against the government by a defendant accused of aiding and abetting a person who had been acquitted in an earlier trial *by a jury.*[8]

7. Essentially, the principle of non-mutual collateral estoppel is that if a litigant has fully and fairly litigated an issue *and lost,* then third parties unrelated to the original action can bar the litigant from re-litigating that same issue in a subsequent suit. The stated requirement of being a loser is accurate but superfluous; it is built into the structure of the principle that there must have been a previous opportunity to litigate. If "A" sues "B" and loses on issue "X", then "C" can avail itself of an estoppel against "A" on issue "X" if "A" sues "B". *See Blonder–Tongue Laboratories, Inc. v. Univ. of Ill. Found.,* 402 U.S. 313, 321–35, 91 S.Ct. 1434, 1439–46, 28 L.Ed.2d 788 (1971) (defensive use of collateral estoppel). If "A" sues "B" and "B" loses on issue "X", then (with some exceptions), "C" can sue "B" and prevail on issue "X" by operation of collateral estoppel. *See Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329–31, 99 S.Ct. 645, 650–52, 58 L.Ed.2d 552 (1979) (offensive use). But previous *winners* can never invoke the principle, because the *new* opponent will not have had an opportunity to litigate the issue. For example, if "A" sues "B" and "A" wins on issue "X", then "A" sues "C" in a case involving issue "X", "A" cannot invoke collateral estoppel but must re-litigate the issue with "C". Or again, if "A" sues "B" and "B" wins on issue "X", "B" cannot bar a suit by "C" based upon issue "X".

8. *See also United States v. Davila,* 698 F.2d 715, 720–21 (5th Cir.1983) (prior jury acquittal of the

■ This case is not quite so simple, however. Mollier's argument is not that the government is estopped by an earlier acquittal *by jury* of his co-defendant Lovato; after all, the jury in a criminal case (or a judge, for that matter [9]) is not required to convict a defendant against whom the prosecution raises legally sufficient evidence. Therefore, it would be perfectly consistent and lawful for one jury to acquit one defendant and another jury to convict a second defendant *on the very same evidence.* Moreover, the jury is permitted to exercise leniency, so that it can even acquit a defendant whom it considers guilty of the crime as charged and convict another on the same crime.

■ None of these considerations is present in this case. Here, a *judge* had previously determined that the same evidence was *legally insufficient* to convict a co-defendant. Mollier's argument for non-mutual collateral estoppel against the government is thus more compelling than that of the defendant in *Standefer* and similar cases involving earlier *jury* acquittals. Nevertheless, we believe the Court's reasoning in *Standefer* also precludes application of the doctrine in a situation such as that *sub judice.*

At the outset, some of the reasons given by the *Standefer* Court do pertain only to prior jury acquittals: Criminal juries are permitted to acquit out of "compassion and compromise," while civil juries are not. 447 U.S. at 23, 100 S.Ct. at 2007. Also, that different juries may reach different results under any criminal statute is "one of the consequences we accept under our jury system." *Id.* at 26, 100 S.Ct. at 2009 (quoting *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)).

On the other hand, other reasons set forth in *Standefer* apply with equal force even when the previous resolution of the issue was by a judgment of acquittal based upon insufficient evidence: That the government cannot appeal from a jury verdict or a denial of its request for a new trial—so even clearly erroneous verdicts are not subject to correction—applies equally to erroneous grants of motions to acquit before the case is submitted to a jury. *Id.* at 23, 100 S.Ct. at 2007. *See also United States v. Martin Linen Supply Co.,* 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977).

Moreover, under complex evidentiary and exclusionary rules, suppression of evidence in a prior case can frequently result in an acquittal of one or more defendants, although the same evidence may be used against other parties to the crime in a second case. If this concern were applied on a case-by-case basis, then the policy justification for collateral estoppel—efficient use of judicial resources—would disappear in a sprawling new form of pretrial litigation over whether the adverse evidentiary ruling in the first trial had deprived the government of its "full and fair" opportunity to litigate an issue in the second. *See Standefer,* 447 U.S. at 25, 100 S.Ct. at 2008. Finally, these efficiency concerns that drive the collateral estoppel policy on the civil side are not nearly so important in criminal cases; criminal cases involve a "public interest in the accuracy and justice of criminal results" that "outweigh[s] the economy concerns that undergird the estoppel doctrine." *Id.* at 26, 100 S.Ct. at 2009.

In sum, given the rationale of *Standefer,* we conclude that non-mutual collateral estoppel has no application in criminal cases. This being so, we need not reach the question of whether the evidence and issues

---

sole co-conspirator); *United States v. Espinosa-Cerpa,* 630 F.2d 328, 333 (5th Cir.1980) (prior jury acquittal of all co-conspirators); *United States v. Musgrave,* 483 F.2d 327, 333 (5th Cir.), *cert. denied,* 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973) (prior jury acquittal of the principal where defendant charged with aiding and abetting); *United States v. Irvin,* 787 F.2d 1506, 1512–13 (11th Cir.1986) (prior jury acquittal of all co-conspirators).

**9.** *Cf. Harris v. Rivera,* 454 U.S. 339, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981) (habeas petitioner was convicted, and apparent accomplice was acquitted, in a state criminal case tried to the court; held: no constitutional problem with apparent inconsistency; trial judge could have legitimately felt and acted upon lingering doubts as to the apparent accomplice's guilt while deciding that the petitioner was guilty beyond a reasonable doubt).

presented in the trial of Lovato are sufficiently similar to those raised in the trial below as to satisfy the requisites for applying collateral estoppel; nor need we determine whether the evidence presented at Mollier's trial would have been admissible even if the government had been estopped from bringing the counts on which the trial judge previously acquitted a co-conspirator.

## III.

For the foregoing reasons, the defendant's conviction is AFFIRMED.