**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 98-30365

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RICHARD D. BARNETT; VIRGIL R. DRAKE,

Defendants-Appellants.

---

Appeals from the United States District Court
for the Western District of Louisiana

---

November 22, 1999

Before POLITZ, DeMOSS, and BENAVIDES, Circuit Judges.

POLITZ, Circuit Judge:

Richard D. Barnett and Virgil R. Drake appeal convictions for conspiracy to commit murder for hire in violation of 18 U.S.C. §§ 371 and 1958, and for aiding and abetting each other in attempted murder for hire in violation of 18 U.S.C. §§ 1958 and 2. For the reasons assigned we affirm the convictions of Barnett and reverse the convictions of Drake.

Background

The record establishes that the relevant events began in early July 1997 in Belize City, Belize where Barnett, an American citizen, had been working for several months. He was scheduled to return to the United States on July 12. While in Belize he frequented a local gymnasium, Body 2000, and became acquainted with Rushiel Bevans, a Belize native, who worked there as a trainer and bodybuilder. On July 11, Barnett and Bevans had dinner together at a restaurant.[1] They left the restaurant in Barnett's truck. Just prior to leaving, Bevans activated a miniature tape recorder hidden in his clothing, and recorded their conversation.

While in Barnett's truck they discussed plans for Bevans to travel to Lafayette, Louisiana and kill one or possibly two individuals. One of the intended victims

---

[1] Barnett contends that the purpose of the meeting was to discuss his plans to start a health food business in Belize and to seek the participation of Bevans who was holder of the "Mr. Belize" bodybuilding title. Bevans maintains that the meeting was arranged the previous day at Body 2000 when Barnett approached him and said, "I am looking for a son-of-a-bitch to kill someone for me." Bevans testified that the July 11 meeting was to discuss this subject. He brought a tape recorder with him and recorded their conversation. At trial Barnett proffered the notes of DEA agent Art Elliot reflecting a call from Bevans on July 10 informing about the meeting scheduled for the next day.

was Ernest L. Parker, a Lafayette attorney who Barnett claimed had cheated him out of money in a crooked stock transfer. Litigation between Parker and Barnett was pending and Barnett made no secret of his animosity towards Parker. Barnett questioned Bevans about his seriousness in carrying out the homicide. He asked Bevans if he had a passport, gave him detailed instructions on construction of a silencer for use with a firearm, discussed the amount of money he would pay Bevans, and offered a "twenty Gs kicker" if the murder resulted in a prompt settlement of his lawsuit against Parker. He advised of Parker's habits, such as his travels and the time he arose in the morning. He also told Bevans that he had contemplated committing the murder himself and described how he might dispose of his clothing to prevent the police from finding traces of gun powder on them.

Barnett continued the discussion, explaining that he had a "brother" in the United States who had made arrangements with a potential assassin but those plans went awry when that person was arrested on an unrelated

3

matter. He promised Bevans more information after he spoke with the "brother" and suggested that they meet the next day at Body 2000. Bevans, in turn, boasted of his time in Leavenworth, told Barnett the preferred method of contact between them, explained how money should be transferred, when he would obtain a firearm, and other details designed to persuade Barnett of his ability to break and evade the law.

The next day Barnett gave Bevans written information, including where Virgil Drake could be reached in Louisiana, and a series of code phrases for contacting him.[2] Barnett then left for the United States. Bevans contacted Art Elliot, a DEA agent stationed in Belize, who contacted the FBI.

Upon arriving in Lafayette, Bevans contacted Drake as instructed. Drake met Bevans and FBI undercover agent

_____

[2] The note instructed Bevans to call Drake and leave his return number and a message that he needed Drake to inspect a water well near Abbeville, Louisiana. Drake was to respond, "Joe, where can papers on well be inspected?" At that, Bevans was to disclose his location so that Drake could bring him additional information. Barnett claims that he went to Bevans' home in order to terminate the scheme, and that it was only after Bevans threatened to harm his children that he brought Bevans the information on how to contact Drake.

Mike Chatman, posing as Bevans' former cellmate at Leavenworth, and delivered maps to Parker's house and to the house of a second target, Logan Nichols, and biographical data and a photo of Parker. Bevans and Chatman told Drake they needed more money and Drake agreed to pass that message on to Barnett in Houston. Shortly thereafter Barnett called Bevans and arranged a meeting in Orange, Texas that afternoon.

At that meeting Barnett, Bevans, and Chatman finalized plans for the murder. Barnett described Parker's auto, the golf club Parker frequented, and the homes of Parker and Nichols and he offered to cover any additional expenses. Later that day Drake drove Bevans and Chatman to Parker's home and showed them the best route from it to Interstate 10.

Barnett and Drake were arrested and charged with conspiracy to commit murder for hire and with aiding and abetting each other in attempted murder for hire. At trial, Barnett sought to explain all of the taped conversations as a combination of barroom talk, nervous chatter, and attempts to extricate himself from

situations with Bevans and Chatman in which he felt he and his family were in danger.[3]  He claimed that he never wanted Parker and Nichols killed, and was only feigning agreement with Bevans in order to placate him.   He requested, but did not receive, an entrapment instruction.  Drake argued that he was not sufficiently aware of what was going on to support convictions for conspiracy and aiding and abetting.  The jury returned verdicts of guilty on both counts for both defendants.  Barnett received a 60-month sentence on Count I and a 120-month sentence on Count II, to be served consecutively.  Drake received a 60-month sentence on Count I and a 97-month sentence on Count II, to be served concurrently.  Both timely appealed.

## Analysis

---

[3] Barnett sought to support this claim with evidence that Bevans was a dangerous character.  He questioned Bevans about his time in prison for gun running activities, his alleged drug activities, use of an assumed name, alleged sham marriage, dishonorable discharge from the United States military, deportation from the United States, current tax deficiency in Belize, and a fistfight with his boss.  He also claimed Bevans knew where his children lived in Louisiana, and said that he suspected Bevans of being involved in a hit-and-run accident in which his daughter was injured.  His hope, he says, was that if he paid Bevans enough money, Bevans would simply leave him alone.

Entrapment.

Barnett contends that the district court erred by not granting his request for an entrapment instruction. We review the refusal to give a requested jury instruction for abuse of discretion.[4] In general, the trial court is given great latitude in formulating its instructions,[5] and we will not find an abuse of discretion where the "instructions . . . fairly and adequately cover the issues presented by the case."[6] The trial court must be mindful, however, of the defendant's right to request and receive jury instructions regarding the particulars of his defense which, ultimately, could affect the jury's verdict. "It has long been well established in this Circuit that it is reversible error to refuse a charge on a defense theory for which there is an evidentiary foundation and which, if believed by the jury, would be legally sufficient" to support a verdict of not guilty.[7]

---

[4] **United States v. Pennington**, 20 F.3d 593 (5th Cir. 1994).

[5] **United States v. Rochester**, 898 F.2d 971 (5th Cir. 1990).

[6] **United States v. Mollier**, 853 F.2d 1169, 1174 (5th Cir. 1988).

[7] **United States v. Rubio**, 834 F.2d 442, 446 (5th Cir. 1987) (quoting **United States v. Lewis**, 592 F.2d 1282, 1285 (5th Cir.

7

The trial court must charge the jury on a defense theory if there is sufficient evidence reasonably to find in favor of the defendant thereon.[8] To warrant an entrapment instruction the defendant need only show a basis for reasonable doubt on the ultimate issue whether the criminal intent originated with the government.[9] The mere assertion of entrapment does not suffice.[10] The defendant must present evidence sufficient to sustain a jury finding on both prongs of the entrapment defense; that is, "the record must contain sufficient evidence of both inducement and lack of predisposition to raise an entrapment issue; the entrapment issue need not be presented to the jury if the evidence does not raise the issue to that degree."[11]

Barnett claims that Bevans induced his participation

---

1979)).

[8] **United States v. Collins**, 972 F.2d 1385 (5th Cir. 1992) (citing **Mathews v. United States**, 485 U.S. 58 (1988)).

[9] **United States v. Bradfield**, 113 F.3d 515 (5th Cir. 1997) (citing **United States v. Nations**, 764 F.2d 1073 (5th Cir. 1985)).

[10] **Mathews v. United States**, 485 U.S. 58 (1988); **United States v. Menesses**, 962 F.2d 420 (5th Cir. 1992).

[11] **Bradfield**, 113 F.3d at 521.

in the murder for hire scheme, testifying that the idea of killing Parker was initiated by Bevans before any of the taped conversations, and that Bevans prevented his withdrawal when he went to Bevans' house.

Barnett may satisfy the government inducement prong of entrapment only if Bevans was a government agent at the time of the alleged inducement.  The defense of entrapment is not applicable where one is induced to engage in criminal activity by a private citizen acting alone.[12]  Entrapment is available only to the innocent defendant whom the government seeks to punish for an offense "which is the product of the creative activity of its own officials"[13] or "born in the minds of government agents."[14]  "Entrapment as a defense occurs only when criminal conduct is the product of the creative activity of government officials or those private citizens acting

---

[12] **United States v. Prieto-Olivas**, 419 F.2d 149 (5th Cir. 1969); **Pearson v. United States**, 378 F.2d 555 (5th Cir. 1967).

[13] **Sorrells v. United States**, 287 U.S. 435 (1932).

[14] **Prieto-Olivas**, 419 F.2d at 150 (citing **Kivette v. United States**, 230 F.2d 749 (5th Cir. 1956)).

9

under government direction."[15]

Barnett contends that Bevans was an agent of the government because of his previous contacts with Elliot and the DEA. Bevans had known Agent Elliot during the more than two years that Elliot worked out at Body 2000. On one prior occasion Bevans provided the DEA with information that someone at the U.S. Embassy in Belize might be in danger. Bevans refused to cooperate further in the investigation, despite being promised that the government would "take care of him." On July 10, the day Bevans asserts Barnett first suggested the deal, Bevans called Elliot. Elliot's notes of that call reflect that Elliot told Bevans to call when he had more details. Bevans and Elliot did not speak again until after Barnett left Belize on July 12. Elliot later heard the July 11 tape and put Bevans in contact with the FBI. FBI agents then began to give Bevans directions and promised to fly him to the United States and help him find his wife in exchange for his cooperation with the remainder of the investigation.

---

[15] **United States v. Dodson**, 481 F.2d 656, 657 (5th Cir. 1972).

The district court did not abuse its discretion in concluding that Barnett's evidence was insufficient to establish a jury question as to Bevans' status as a government agent prior to July 13, the time Barnett alleges Bevans induced him to participate in the murder for hire scheme. Barnett failed to produce any evidence that Bevans acted under the direction or supervision of the government during the initial stages of the scheme. Agent Elliot's notes on July 10 reflect only that he passively received information and asked Bevans to keep him informed of future developments. This was an informal request for future information, not an agreement that Bevans would work on behalf of the government to obtain that information.[16]

Barnett correctly points out, however, that an informer may be an agent of the government even if its officials do not directly orchestrate his activities. Law enforcement authorities may not make promises to private citizen informants in exchange for their efforts in instigating crimes and then secure insulation from

---

[16] **United States v. Busby**, 780 F.2d 804 (9th Cir. 1986).

charges of entrapment simply by leaving the informers to their own devices.[17]  To allow such a practice would permit the type of government overreaching that the entrapment defense was designed to prevent.  Bevans, however, cannot be characterized as such a "paid government informer" or "active government informer" prior to July 13.  The record contains no evidence that the government made it Bevans' "job" to be the instigator of similar prosecutions.[18]  Barnett produced no evidence that Bevans had been promised anything in exchange for compromising him.  Bevans may have seen value in ingratiating himself with the authorities because of his criminal history and his tax difficulties, but that he may have anticipated compensation for providing information does not make him an agent of the government.[19]  Barnett failed to produce evidence sufficient to sustain a finding that he was induced by the government to commit any crime, and we must therefore

---

[17] **Sherman v. United States**, 356 U.S. 369 (1958); **United States v. Waddell**, 507 F.2d 1226 (5th Cir. 1975).

[18] **Sherman**, 356 U.S. 369.

[19] **Busby**, 780 F.2d 804.

conclude that the district court did not abuse its discretion by declining to give an entrapment charge.

Denial of the Motion for Continuance.

Barnett next contends that the trial court erred by refusing to grant his motion for a continuance.  He made several requests for **Brady**[20] material prior to trial.  Each of his requests was met with a representation by the government that no such material existed.  Then on the first day of trial, the government delivered a report from the Joint Intelligence Coordinating Center containing information about Bevans' criminal history and his contacts.  Barnett claims that he needed a continuance in order to investigate Bevans' background adequately.

We review the denial of a motion for continuance for abuse of discretion.[21]  To prevail, the movant must show that the denial resulted in "'specific and compelling' or 'serious' prejudice."[22]  Barnett maintains that he needed

---

[20] **Brady v. Maryland**, 373 U.S. 83 (1963).

[21] **United States v. Krout**, 66 F.3d 1420 (5th Cir. 1995).

[22] **Id.** at 1436.

13

information on Bevans' criminal history and criminal contacts in order to develop his theory that Bevans entrapped him to ingratiate himself with the authorities. Bevans was not a government agent. Whatever his motives, he therefore could not have entrapped Barnett. The failure to produce the information at an earlier time did not prejudice Barnett's defense, and the denial of the continuance was not an abuse of discretion. We find no "specific and compelling" or "serious" prejudice. Admission of Informant's Testimony.

Barnett and Drake both contend that Bevans' testimony should not have been admitted at trial because he received $7500 for his participation in the case. They assert that the payment violates 18 U.S.C. § 201(c)(2), which prohibits the giving of anything of value to a witness in exchange for testimony. This issue was not raised at trial and we review for plain error.

We previously have held that section 201(c)(2) is not violated when prosecutors offer leniency to a witness in exchange for testimony.[23] "'[N]o practice is more

_____

[23] **United States v. Haese**, 162 F.3d 359 (5th Cir. 1998).

14

ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises him a reduced sentence."[24] We have opted to protect the judicial process from the stain of perjury with other safeguards, including the prohibition on the use of perjured testimony, the requirement that the government disclose such arrangements, the opportunity for defense counsel to engage in rigorous cross-examination, and the instruction of the jury on the suspect nature of compensated testimony. Because of these safeguards and because "the compensated witness and the witness promised a reduced sentence are indistinguishable in principle and should be dealt with in the same way,"[25] we hold that 18 U.S.C. § 201(c)(2) is not violated when prosecutors compensate informants for their cooperation.

---

[24] **Id.** at 366 (quoting **United States v. Cervantes-Pacheco**, 826 F.2d 310, 315 (5th Cir. 1987)).

[25] **Cervantes-Pacheco**, 826 F.2d at 315.

Motion to Sever.

Drake maintains that the trial court erred by denying his motion to sever. He claims that the "spillover effect" of the evidence presented against Barnett confused the jury to such a degree that severance was required in order to avoid undue prejudice to his defense.

We review the denial of a motion to sever for abuse of discretion.[26] As a general rule, defendants who are indicted together are tried together.[27] The decision whether to sever the trials of persons indicted together is within the discretion of the trial court, and the denial of a severance will not furnish grounds for reversal unless the defendant can demonstrate specific compelling prejudice against which the district court was unable to afford protection.[28] A joint trial is especially appropriate when the defendants are alleged to

---

[26] **United States v. Faulkner**, 17 F.3d 745 (5th Cir.), <u>cert</u>. <u>denied</u>, 513 U.S. 870 (1994).

[27] **Id.**

[28] **United States v. Hernandez**, 962 F.2d 1152 (5th Cir. 1994).

have been participants in the same conspiracy.[29] Severance is necessary only when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable determination of guilt or innocence."[30]

We find that the district court acted within its discretion in denying Drake's motion to sever. Drake was not prejudiced in the presentation of any defenses as a result of being tried jointly with Barnett. Nor was severance required so that the testimony of a coconspirator could be compelled without violating the coconspirator's fifth amendment rights. In fact, Drake's only alleged coconspirator, Barnett, testified at trial, was cross examined by Drake's attorney, and generally gave information that supported Drake's defense. Stripped to its essentials, Drake simply argues that the quantum of evidence against Barnett and the chilling nature of the taped conversations between Barnett and Bevans made it impossible for the jury to decide his case

---

[29] **Faulkner**, 17 F.3d 745.

[30] **United States v. Bermea**, 30 F.3d 1539, 1572 (5th Cir. 1994).

fairly. Even if Drake's defense had been tainted to some degree by the evidence against Barnett, however, the existence of some spillover effect ordinarily does not require severance.[31] In this case, any prejudice that might have resulted from Drake's being tried with Barnett was neutralized by the trial court's instruction to the jury that it must consider the charges and evidence against Barnett and Drake separately.[32]

Sufficiency of the Evidence.

Finally, Drake argues that there was not sufficient evidence to support his conspiracy and aiding-and-abetting convictions. We review a claim of insufficient evidence to determine whether a rational trier of fact could have found that the evidence proved the essential elements of the crime beyond a reasonable doubt.[33] The evidence presented at trial is viewed with all reasonable

---

[31] **Faulkner**, 17 F.3d 745.

[32] **United States v. Lindell**, 881 F.2d 1313 (5th Cir. 1989) (holding that defendant must show that he suffered "specific and compelling prejudice" that could not be mitigated by lesser measures than severance, including a proper limiting instruction).

[33] **United States v. Ramirez**, 145 F.3d 345 (5th Cir. 1998).

inferences made in support of the jury's verdict.[34]

Drake argues, and the government concedes, that in order to obtain a conviction for either crime, the government must show beyond a reasonable doubt that Drake acted with the intent that a murder be committed in violation of the laws of any state or of the United States.

> It is a cardinal rule of conspiracy law that one does not become a coconspirator simply by virtue of the knowledge of a conspiracy and association with conspirators. . . . To connect the defendant to a conspiracy, the prosecution must demonstrate that the defendant agreed with others to join the conspiracy and participate in the achievement of the illegal objective.[35]

In order to convict a defendant of conspiracy to violate a federal statute, "the Government must prove at least the degree of criminal intent necessary for the substantive offense itself."[36]  Likewise, in order to sustain its case that the defendant aided and abetted in the violation of a federal statute, the government must

---

[34] **United States v. Thomas**, 120 F.3d 564 (5th Cir. 1997).

[35] **United States v. Grassi**, 616 F.2d 1295, 1301 (5th Cir. 1980) (citations omitted).

[36] **United States v. Feola**, 420 U.S. 671, 686 (1975); **United States v. Osgood**, 794 F.2d 1087 (5th Cir. 1986).

19

prove that the defendant "shared in the criminal intent of the principal."[37]  Here, the underlying federal statute requires proof of "intent that a murder be committed in violation of the laws of any state or the United States. . . ."[38]  Drake argues that he blindly followed Barnett's instructions and that he was never made aware of what Barnett was up to or the reason why Barnett had asked Bevans and Chatman to come to Lafayette.

The government's evidence on this issue essentially is two recorded meetings between Drake, Bevans, and Chatman that took place at the hotel in Lafayette and in Drake's truck while driving through Lafayette.  At the hotel, Drake delivered a package containing maps to the homes of Parker and Nichols.  Drake's fingerprints were on the maps.  Drake appeared to be nervous during that meeting, suggesting consciousness of guilt.  When asked directly about the extent of his knowledge by Chatman, Drake admitted that he knew "a lot of it" but was "not gonna say I know anything and I'm not gonna tell you I

---

[37] **United States v. Ortiz-Loya**, 777 F.2d 973, 980 (5th Cir. 1985).

[38] 18 U.S.C. § 1958.

20

know everything." Later that evening, Drake drove Bevans and Chatman to Parker's home. It was clear that Drake knew that their objective involved Parker, because neither Bevans nor Chatman mentioned Parker's name or asked to be taken to his home. Drake stated that he formerly had been involved in law enforcement and that "this" meant that he would have been on "both sides of the fence." He knew a lot of people in the town of Jennings and refused to be seen there with Bevans and Chatman. After taking them to Parker's house, he instructed them on the quickest way to get to I-10. The government also avers that because Drake and Barnett were close friends, Drake must have known of Barnett's intense hatred for Parker. Finally, telephone records indicate that Drake and Barnett were in close contact during the relevant time period.

The foregoing is compelling evidence of the fact that Drake knew that Bevans and Chatman had been hired to perpetrate some unlawful act against Parker and Nichols. It does not, however, represent evidence that Drake knew that the unlawful act was murder. The government

concedes that Bevans and Chatman did not use words like "kill," "murder," "death," "hit," or "contract" when talking with Drake as they had with Barnett. Nor did they discuss, or otherwise indicate, that they were carrying or intended to use any instrument that might be employed to carry out a murder. The evidence presented by the government is equally consistent with the possibility that Drake believed that Bevans and Chatman intended to kidnap or threaten Parker or a member of his family, or to vandalize or burglarize his house, or to obtain information about Parker that Barnett could use to extort a favorable settlement from him. The jury reflected confusion on this very point when it asked, "must we consider conspiracy to commit a crime or must we specifically consider a conspiracy to commit 'murder for hire' to make/come to a decision according to the charges?"[39] The government's evidence that Drake was

---

[39] In response to this question, the trial judge simply referred the jury to the indictment and the instructions. Drake does not question the propriety of this response; we need not consider it to decide this appeal.

aware that some crime was afoot is not sufficient.[40] Because the record is devoid of evidence that Drake intended to conspire in or aid and abet the commission of murder for hire, we must reverse Drake's conviction on both counts.

Barnett's convictions for aiding and abetting and conspiracy to commit murder for hire are AFFIRMED. Drake's convictions for aiding and abetting and conspiracy to commit murder for hire are REVERSED.

---

[40] **United States v. Jordan**, 627 F.2d 683 (5th Cir. 1980); **United States v. Ritter**, 989 F.2d 318 (9th Cir. 1993).