RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0292p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ANGEL CORDERO (19-3540); EDUARDO RIOS
VELASQUEZ (19-3543),

*Defendants-Appellants*.

Nos. 19-3540/3543

─────────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:17-cr-00342—Benita Y. Pearson, District Judge.

Argued: August 5, 2020

Decided and Filed: September 3, 2020

Before: ROGERS, KETHLEDGE, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Joseph V. Pagano, Rocky River, Ohio, for Appellant in 19-3540. Richard P. Kutuchief, THE KFARM, Coventry Township, Ohio, for Appellant in 19-3543. Daniel R. Ranke, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Joseph V. Pagano, Rocky River, Ohio, for Appellant in 19-3540. Richard P. Kutuchief, THE KFARM, Coventry Township, Ohio, for Appellant in 19-3543. Daniel R. Ranke, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

---

**OPINION**

---

ROGERS, Circuit Judge.   Defendants Angel Cordero and Eduardo Velasquez were convicted by a jury of conspiring to commit murder for hire and conspiring to distribute one kilogram of cocaine.   On appeal, defendants argue that their convictions were not supported by sufficient evidence and challenge the admission of other-acts evidence under Federal Rule of Evidence 404(b).   Defendants also raise sentencing claims.   Defendants' challenges to their convictions fail because the record demonstrates a sufficient factual basis for their guilt on the charged offenses.   Also, the district court correctly admitted the challenged bad-act evidence, as that evidence served permissible purposes under Rule 404(b) and was probative of contested issues in the case.   Finally, the district court properly applied the Sentencing Guidelines to calculate Cordero's base offense level.   However, as the Government concedes, a limited remand is required with respect to Velasquez, who was incorrectly sentenced as a career offender.

## I.  Factual and Procedural Background

In March of 2007, Angel Cordero was confined at the Fort Dix correctional facility in New Jersey, where he was serving a 40-year sentence.   During his incarceration at Fort Dix, Cordero met Marc King, another inmate who lived in the same dorm.   King was serving a sentence for his role in a long-running cell phone insurance fraud scheme.   While out of prison on bond, King engaged in stock market manipulation fraud that added time to his sentence.   King offered to help Cordero and other inmates at Fort Dix "fix" their credit ratings through identity theft.   Contraband was rampant at Fort Dix, and King would routinely rent smartphones with internet access from other inmates in order to conduct his fraud.   Cordero himself owned a small "flip phone" which he used to call and send text messages.   In return for his services, King would receive monetary payment or, in the case of Cordero, assistance in marketing his skills to other prisoners.

King was eventually introduced (virtually) to Cordero's friend and co-defendant Eduardo Velasquez.   Cordero and Velasquez had spent eleven years together as cellmates in prison, and

the two maintained a close bond. At the time, Velasquez was out of prison but still on probation in Lorain, Ohio. King began assisting Velasquez in fraudulently obtaining products from Home Depot and other hardware stores that were used for Velasquez's landscaping business. The landscaping equipment was purchased with stolen credit cards that King bought off black-market websites. King was also able to secure a fake ID for Velasquez's brother using a stolen social security number.

Cordero eventually asked King if he would be able to locate the address of a woman named Tyra Goines. Cordero said that Velasquez wanted to kill Goines. Cordero did not explain the exact connection between Goines and Velasquez, but gave a vague story about how Goines had profited off a drug robbery during which her boyfriend, Glenn Smith, was killed. Glenn Smith was purportedly the brother of Velasquez's drug supplier. King expressed his disbelief of Cordero's story, prompting Cordero to call Velasquez, who explained that he and someone else were looking for Goines and that the private investigator they had hired was not able to find her. Cordero told Velasquez that King would be able to help. Cordero proceeded to ask Velasquez, "[i]f you find her, what are you going to do [?]" to which Velasquez responded, "I'm going to tie her up and get rid of the bitch." Upon learning that Velasquez wanted to kill Goines, King contacted his attorney to inform the Government of the murder scheme, hoping to receive a reduced sentence in return. Meanwhile, King had no difficulty locating Goines' address in an online version of the white pages. King was also able to find Goines on a number of social media and messaging websites. Cordero and Velasquez promised King payment in exchange for locating Goines' address.

During the same period, Velasquez also sought King's assistance in rerouting a package being shipped from Puerto Rico to Ohio. Velasquez told King on the phone that "if we can reroute the stuff that I've got, we'll be rich." Velasquez also told King that, had he known earlier that King had the ability to reroute packages, they would have "been rich already." King testified that he understood this to mean that the package contained drugs because Cordero had told him that Velasquez was a drug dealer and King had heard Velasquez make statements indicating his involvement in drug trafficking. Velasquez elaborated that by rerouting the package, he and King were going to "burn the supplier." King thought this meant that Velasquez

would avoid paying the supplier by reporting that the package never arrived, thereby allowing him to sell the drugs for a higher profit.

On June 29, 2017, King met with Government agents at Fort Dix and discussed both the murder and drug distribution plots. During the meeting, the Government promised King that, in exchange for his cooperation, he would not be prosecuted for his illegal activity while in prison and would receive consideration for a reduction in his sentence. However, the Government forbade King from engaging in any further illegal activity even as part of the investigation into Cordero and Velasquez. As part of its investigation, the Government subpoenaed Cordero's phone records, which showed that Cordero and Velasquez had conducted 21 calls between June 29th and 30th.

The drug and murder schemes continued to progress after King met with the Government. Cordero told Velasquez that he wanted $1,500 in exchange for the information about Goines' address, which was to be split evenly between Cordero and King. Velasquez responded that he would have to "[w]ait for [his] man to get back in town" in order to negotiate the price. King testified that Velasquez's "man" was referred to as "Victor" and "the California guy," and Victor was said to have owned the drugs that Goines purportedly ran off with. King further testified that he understood Victor to be paying Velasquez to murder Goines. Forty-eight hours later, Velasquez conducted a call during which King negotiated a price of $1,500 with Victor. Cordero and Velasquez also asked King to reroute[1] a package containing surveillance equipment they had ordered from a spyware company called Brickhouse security and instructed King to have it shipped to Velasquez's address in Lorain, Ohio. Cordero and Velasquez indicated to King that this equipment, which included night vision goggles, a listening device, and nano GPS, was to assist in staking out the area where Goines lived. Velasquez had also by this time sent Cordero a text message with the tracking number for the drug package. King had told Cordero and Velasquez that his aunt worked for the post office and would help reroute the package. King's "aunt" was in reality special agent Diana Spangenberg of the Drug

---

[1]The package had to be "rerouted" because, as with the landscaping equipment, the spyware was purchased with a stolen credit card that had a shipping address associated with it. Once the package was shipped from the company's warehouse, it would appear in United Parcel Service's online tracking system. King would then utilize a subscription service offered by UPS called "My Choice" that allowed customers to redirect a package mid-shipment.

Enforcement Administration.  Cordero gave King the tracking number, and King in turn covertly texted it to Spangenberg.  That tracking number was eventually traced by postal inspectors to a package containing one kilogram of cocaine.

On July 7, 2017, King met again with Government agents, who this time equipped King with a recording device disguised as a credit card.  The agents told King that he would wear the device for around four hours.  King secretly recorded Cordero while the two engaged in a series of conversations, covering both the alleged murder-for-hire and drug-trafficking schemes.  First, Cordero and King discussed the status of the Brickhouse Security package, with Cordero telling King how happy Velasquez would be when it arrived.  The discussion next covered the status of the drug package.  Cordero asked King, "[y]ou wanna check the post office?"  Cordero recited the tracking number to King, who plugged it into the post office's website.  The check of the post office website revealed that the package never made it to Ohio and had been sent back to Puerto Rico.  Cordero reassured King, however, stating, "don't worry about the package.  Once it gets back to Puerto Rico, they'll retrieve it."  The audio captures Cordero's instructing King to take a screenshot of the post office website that showed the package's arrival in Puerto Rico.  Cordero then told King to send the screenshot to Velasquez, along with a message that Cordero dictated.

To prompt Cordero about the murder plot, King pretended to be worried that he would not be paid because Velasquez would be afraid to act.  Cordero denied that Velasquez was scared. Cordero then described what Velasquez planned to do: Velasquez would be paid by "his man," presumably Victor, to find Goines' address and would follow up with an offer to kill Goines for payment:

| | |
|---|---|
| Cordero: | Yeah, cause once he [Velasquez] finds that, he sees . . . he's not going to give that information to him [Victor], he's going to sell it to him |
| King: | That's what I'm saying . . . sell it for what, don't, isn't he the one that's going to take the hit anyway?  Isn't he the one taking the hit? |
| Cordero: | That's what I'm saying, we got the bitch |
| King: | I know, what I'm saying is, why the hell he sell it if he's going to be the one taking the hit? |
| Cordero: | That's what I'm saying, he's gonna, he's gonna do that . . . OK |

. . .

King:          I don't know . . . (Unintelligible) . . . I don't know if this shit is real, if he's gonna, no, I'm just saying, cause, listen, the thing that's confusing me, right, is, he gonna sell it to him and get paid for the hit

Cordero:       He's gonna, he's gonna, basically, once he got her: "I got her, what you wanna do?"

King:          But . . .

Cordero:       I got her address, I got everything, you want that, you want to pay for that, or you want to pay for the full service, basically…

King:          (Laughing) Now, the full service would be…it is what it is

Cordero:       Whatever they gonna, whatever he decides he wants

Soon after receiving Goines' address from Cordero, Velasquez texted Cordero, telling Cordero that he had plugged Goines' address into his phone's GPS and had left to go scope out the residence.  Cordero is then heard on tape saying, "[h]e see that bitch he might throw her in the trunk right now."  When asked about how much Velasquez would be paid to commit the murder, Cordero responded, "[d]epend on what he's gonna do, he's gonna bury the bitch in his backyard, I don't know."  Cordero estimated Velasquez would receive more than $20,000, but then stated, "I don't know what they gonna do to be honest."  Cordero also graphically described how he would commit the murder were he able to.

Hours after King finished recording Cordero on July 7th, law enforcement arrested Velasquez.  In Velasquez's phone was a text message sent that day to a contact identified only as "Leon."  The message contained Goines' address, a picture of her car, and the words "happy birthday."  "Leon" responded with three emojis representing the proverb "hear no evil," "see no evil," and "speak no evil."  Investigators subsequently located a man by the name of Leon Stone in Lorain, Ohio who owned the property where Glenn Smith had been murdered.  The "Leon Stone" that officers identified did not have a birthday on July 7th.  Although investigators were not able to confirm that the "Leon" in Velasquez's phone was Leon Stone, there were pictures of Leon Stone stored on the phone.  The Government at trial argued that Leon Stone and "Victor" were in fact the same person and that Stone had hired Velasquez to murder Goines.

Also on July 7th, Cordero was placed in solitary confinement at Fort Dix. He was mistakenly released into general population, however, on July 11th. Upon his release, Cordero met with friend and fellow inmate Miguel Rosario, who was able to procure a cell phone for Cordero. While with Rosario, Cordero called Velasquez's girlfriend and discovered that Velasquez had been arrested and charged, along with Cordero, with murder for hire. According to Rosario, Cordero immediately suspected that King, whom he referred to as "the kid" or "the hacker," had been cooperating with law enforcement. Cordero then asked Rosario to murder King. When Rosario refused, Cordero offered to pay him for King's death, but Rosario still refused. Cordero then said that he would kill King himself. Rosario also testified that Cordero mentioned a drug package that King had tried to reroute from Puerto Rico.

Tyra Goines testified at trial. Goines told the jury that she knew Leon Stone to be a drug dealer but described him as a friend whom she had not seen in a couples of years. She could not think of why anyone, including Stone, would want her dead. Goines denied knowing Cordero or Velasquez, but admitted it was possible that she had seen Velasquez on Facebook. She also testified that she knew someone by the name of Glenn and remembered seeing the news of Glenn's murder. She did not appear to know Glenn very well, however, claiming not to know his last name.

Before trial, the Government filed a motion in limine to admit various "other-acts" evidence under Federal Rule of Evidence 404(b). Neither defendant responded to this motion and neither raised any objection to this evidence throughout the course of the trial. The district court granted the motion from the bench and expounded on that ruling in a written order published shortly after the conclusion of the trial. Two aspects of this ruling are relevant on appeal. First, the court allowed the admission of testimony from Rosario that Cordero had offered him payment in exchange for King's murder and had vowed to kill King himself upon Rosario's refusal to do so. The court reasoned that this evidence was probative of Cordero's consciousness of guilt and absence of mistake, both of which are proper grounds for admission of other-act evidence and both of which would serve to rebut the defenses put forth at trial, citing *United States v. Franks*, 511 F.2d 25, 36 (6th Cir. 1975) and *United States v. Terry*, 729 F.2d 1063, 1070 (6th Cir. 1984)). The court further determined that the evidence should not be

excluded under Rule 403 because "Cordero is already charged with murder for hire and the Subject Statements do not suggest a more serious crime such that it would unduly prejudice Cordero" (quoting Government's brief).

Second, the court permitted testimony relating to an uncharged conspiracy between Cordero and Velasquez that involved the sale of synthetic marijuana ("K2") at Fort Dix. King, and to a lesser extent Rosario, testified that Velasquez would supply Cordero with K2 that was sprayed onto sheets of paper, which Cordero would sell for a substantial profit to other prisoners. The testimony showed that the K2 conspiracy occurred during the same time as the alleged cocaine conspiracy. The court ruled that the evidence of the K2 conspiracy was admissible to show the defendants' intent to distribute cocaine. Furthermore, the court held, the K2 conspiracy was not more serious than the alleged cocaine conspiracy, and any prejudice was minimized by the use of cautionary instructions.

The district court gave substantially similar cautionary instructions both at the time the other-acts evidence was presented and at the conclusion of trial. One such instruction read as follows:

> You have heard testimony that Defendants committed crimes or wrongs other than the ones charged in the Indictment. If you find that Defendant did these crimes or wrongs, you can consider the evidence only as it relates to the Government's claim on Defendants' intent, knowledge, or absence of mistake. You must not consider it for any other purpose.

Both defendants moved for judgment of acquittal at the close of the Government's case pursuant to Federal Rule of Criminal Procedure 29. Those motions were denied. The jury convicted each defendant of conspiracy to commit murder for hire and conspiracy to distribute cocaine. Cordero filed a post-trial motion for judgment of acquittal under Rule 29(c), which was fully briefed. The court denied the motion in a written order.

The district court sentenced Cordero to a term of 120 months' imprisonment on the murder-for-hire charge (the statutory maximum) and a term of 300 months' imprisonment on the cocaine-conspiracy charge, to be served concurrently to each other but consecutively to Cordero's existing 480-month term of imprisonment. In arriving at its sentence, the district court grouped the murder-for-hire and drug-distribution counts and calculated an offense level of 37

and a criminal history category of III, yielding an advisory Guidelines range of 262-327 months' imprisonment. Cordero did not object to the calculation of his offense level or criminal history score.

As it did for Cordero, the court calculated an offense level of 37 for Velasquez, which Velasquez objected to at the sentencing hearing. Also over Velasquez's objection, the court determined him to be a career offender under the Sentencing Guidelines, which increased Velasquez's criminal history category from IV to VI and set the advisory Guidelines' range at 360 months to life imprisonment. Velasquez argued in particular that neither his murder-for-hire conviction nor his cocaine-conspiracy conviction qualified as a "crime of violence" or "controlled substance offense" under U.S.S.G. § 4B1.2. The court nevertheless varied downward to a criminal history category of III, with a corresponding sentencing range of 262-327 months. The court ordered Velasquez to serve a 120-month sentence on the murder-for-hire conviction (the statutory maximum) to run concurrently with a 262-month sentence on the cocaine-distribution conviction. Cordero and Velasquez each timely appealed.

## II.  Conspiracy to Commit Murder for Hire

There was sufficient evidence to convict Cordero and Velasquez on the charge of conspiracy to commit murder for hire under 18 U.S.C. § 1958. Viewing the evidence in the light most favorable to the Government, a rational jury could have found the essential elements of that crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (stating scope of review). A defendant is guilty of murder for hire when he by himself or in conspiracy with others "use[s] the mail or any facility of interstate or foreign commerce[] with intent that a murder be committed . . . as consideration for a promise or agreement to pay[] anything of pecuniary value." 18 U.S.C. § 1958(a). Defendants do not contest that they used a facility of interstate commerce but do contest that (1) they acted with intent to murder (2) in exchange for payment, and (3) that they entered into a conspiracy.

The Government presented sufficient evidence that each defendant acted with the requisite intent to murder. First, the jailhouse informant, Marc King, testified that he was asked by Cordero to find Tyra Goines' address because Velasquez and a fellow drug dealer wanted to

kill Goines.  When King expressed disbelief, Cordero called Velasquez, who confirmed that he would "tie her up and get rid of the bitch."  Cordero also stated to King during a secretly recorded conversation that Velasquez would receive a significant payout for murdering Goines.  When asked by King exactly how much Velasquez would be paid, Cordero responded, "[d]epend on what he's gonna do, he's gonna bury the bitch in his backyard, I don't know."  In addition, shortly after learning that Velasquez was travelling to scope out Goines' residence, Cordero is heard on tape saying, "[h]e see that bitch he might throw her in the trunk right now."  If this evidence were not enough, Cordero proceeded to describe graphically how he would commit the murder were he not in prison:

| | |
|---|---|
| Cordero: | I would have done it correctly, |
| King: | You don't think he [Velasquez] gonna do it correctly? |
| Cordero: | Not like how I would have done it. |
| King: | So how would you do it then? |
| Cordero: | Nah, he's not gonna get caught, he's gonna do it right, I just take it to another level, like I bring you verification that this is her, you know what I'm saying, what you want, her eyes?  Her teeth?  She got a tattoo you want me to cut out and bring to you? |

While Cordero writes off these comments as "mere speculation and grandiose statements," the jury could have reasonably thought otherwise.  Accordingly, the evidence was sufficient to demonstrate murderous intent on the part of Velasquez and Cordero.

Defendants' arguments to the contrary are unavailing.  Velasquez contends that Cordero's statements about murdering Goines do not establish murderous intent on the part of Velasquez.  This argument ignores King's testimony that he heard Velasquez state on the phone, "I'm going to tie her up and get rid of the bitch."  Moreover, Cordero's statements shed light on Velasquez's intent because the two men were close confidants and spoke with each other frequently.  Velasquez also attempts to impugn King's credibility, arguing that "[t]he claim of conspiracy to commit murder-for-hire, advanced by 'the Fraudster' informant is incredible and conjecture."  A trial witness's credibility, however, is not relevant on review of a Rule 29 motion for judgment of acquittal.  *United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009).  It was the jury's prerogative to believe what King had to say.

Both defendants contend that certain statements by Cordero create reasonable doubt about what exactly Velasquez planned to do beyond verifying Goines' address. At one point, Cordero is recorded as saying, "I don't know what they gonna do, to be honest . . . ." At another point, Cordero tells King, "let them do what they do, we don't need to know what they gonna do." Read in the light most favorable to the Government, however, these statements indicate Cordero's uncertainty regarding the *method* by which Velasquez will murder Goines and dispose of her body. In any event, other evidence in the record leaves no doubt that Cordero and Velasquez understood that Goines would be murdered. When determining if a conviction is supported by sufficient evidence, "[a]ll conflicts in the testimony are resolved in favor of the government, and every reasonable inference is drawn in its favor." *United States v. Vasquez*, 560 F.3d 461, 469 (6th Cir. 2009).

This case is very different from *United States v. Barnett*, 197 F.3d 138 (5th Cir. 1999), relied upon by defendants. There, the Fifth Circuit reversed the defendant's conviction for conspiracy to commit murder for hire. *Id.* at 147. The evidence in *Barnett* demonstrated that the defendant assisted his friends who he knew had been hired to perpetrate "some unlawful act" against the victim. *Id.* at 146. The evidence did not show, however, that the defendant "knew that the unlawful act was murder." *Id.* That the defendant "was aware that some crime was afoot," the Fifth Circuit said, was not sufficient to demonstrate he knowingly joined a conspiracy to murder. *Id.* at 147. In contrast to the facts in *Barnett*, Velasquez and Cordero repeatedly alluded to Goines' murder and never suggested that she would suffer nonfatal injury.

There was also sufficient evidence presented at trial to meet the "pecuniary value" requirement of the murder-for-hire statute. The jury could have reasonably concluded that Velasquez had an agreement—or intended to form an agreement—with Victor to kill Goines for money. The jury heard testimony that Velasquez told Cordero on the phone that he would kill Goines. Velasquez does not argue—nor was there evidence indicating—that he had any personal stake in Goines' murder. It was therefore logical for the jury to infer that Velasquez intended to perform the murder in exchange for money, particularly when there was already someone, i.e., "Victor," who was willing to pay for information on Goines' whereabouts. This inference was further supported by Cordero's recorded statements that Velasquez would be compensated for

Goines' murder. In one such statement, Cordero surmised that Velasquez would receive "probably more" than $20,000, with the exact amount depending on the method in which Goines was killed. In another instance, Cordero remarked that Velasquez "ain't going to do it for peanuts." Finally, the facts that Velasquez travelled to Goines' residence and purchased tracking and surveillance equipment were further indications that he had an agreement in place to commit the murder or intended to enter one.

Defendants repeatedly assert that, although Victor may have agreed to pay Cordero—and perhaps Velasquez—for locating Goines, he did not agree to pay Velasquez to complete the murder. Sure enough, the record supports the possibility that the murder-for-hire plot was to take place in two stages—the first involving locating Goines' address and the second involving Goines' murder. Cordero told King, for instance, that Velasquez would sell "Victor" the information about where Goines lived and then negotiate separately regarding her murder:

| | |
|---|---|
| Cordero: | He's gonna, he's gonna, basically, once he got her: "I got her, what you wanna do?" |
| King: | But… |
| Cordero: | I got her address, I got everything, you want that, you want to pay for that, or you want to pay for the full service, basically . . . |
| King: | (Laughing) Now, the full service would be . . . it is what it is |
| Cordero: | Whatever they gonna, whatever he decides he wants |

It is also true that while King heard firsthand from Victor regarding payment for Goines' address, there was no similar direct evidence presented of an agreement between Velasquez and Victor regarding payment for Goines' murder.

But even so, the absence of an agreement—or even an offer—to commit murder for hire does not foreclose a conviction under § 1958, provided there is a showing of intent on the part of the defendant. *See United States v. Ransbottom*, 914 F.2d 743, 746 (6th Cir. 1990); *United States v. Dvorkin*, 799 F.3d 867, 875-76 (7th Cir. 2015). Furthermore, Velasquez's intent to commit the contract murder is sufficient for a conviction even if Victor himself had no intention of entering into such an agreement. In *United States v. Dais*, we noted that our earlier decision in *Ransbottom* "rejected the argument that § 1958(a) requires 'participation by at least two

persons.'"   559 F. App'x 438, 444 (6th Cir. 2014) (quoting *Ransbottom*, 914 F.2d at 745). Accordingly, even assuming the scope of Velasquez's agreement with Victor included only locating Goines' address, the jury could still have reasonably concluded that Victor intended to, in Cordero's words, perform the "full service" afterwards and, moreover, that Cordero was aware of Velasquez's intention.   This conclusion is even easier to reach when considering the remaining circumstantial evidence, including Velasquez's stated intent to murder Goines; his negotiations with Victor to locate Goines' address for money; his purchase of advanced surveillance equipment; and Cordero's statements about payment in exchange for murdering Goines.[2]

Because the intent-to-murder and pecuniary-value elements are met, the conspiracy element is also met in this case.  To prove conspiracy to violate § 1958, the government must show that (1) the defendant conspired to use an interstate facility with the intent to murder in consideration for money to be paid to the killer; (2) the defendant knowingly and voluntarily joined the conspiracy; and (3) a member of the conspiracy performed an overt act.  *United States v. Burdette*, 86 F. App'x 121, 126 (6th Cir. 2004).  As discussed, there is evidence showing at the very least that Velasquez intended to receive payment from Victor to kill Goines and that Velasquez used a facility of interstate commerce—a cell phone—to work with Cordero to further this intent.   Cordero's recorded statements about Velasquez's murdering Goines for payment further support the conclusion that a murder-for-hire conspiracy existed, and that Cordero was aware of it.   Cordero voluntarily joined the conspiracy by providing information that would assist in locating Goines in exchange for payment of $1,500.  Finally, Velasquez performed an overt act by travelling to Goines' residence to confirm her address, as demonstrated by his taking a picture of Goines' house and car.  Accordingly, a reasonable jury could have found Cordero and Velasquez guilty of conspiring to violate § 1958.

---

[2]Cases cited by the defendants are not to the contrary.  The murder-for-hire conviction in *United States v. Ritter*, 989 F.2d 318, 321 (9th Cir. 1993), was overturned because the defendant did not have knowledge that the murder scheme he had participated in had a contract element.  Here, by contrast, all indications are that Velasquez intended to enter into a scheme in which he would be paid to commit murder.  *United States v. Wicklund*, 114 F.3d 151, 153-54 (10th Cir. 1997), is similarly unhelpful to defendants, as that case turned on the absence of a quid pro quo.  Velasquez's intention to commit murder in exchange for payment from Victor satisfies the quid pro quo requirement.  *See United States v. Acierno*, 579 F.3d 694, 701 (6th Cir. 2009).

### III.  Conspiracy to Distribute Cocaine

The evidence was likewise sufficient for the jury to convict Cordero and Velasquez of conspiracy to distribute cocaine.  To prove its case, the Government had to demonstrate beyond a reasonable doubt that (1) there existed an agreement to violate drug laws (in this case, an agreement to distribute cocaine in violation of 21 U.S.C. § 841); (2) defendant had knowledge of, and intended to join, the conspiracy; and (3) defendant participated in the conspiracy. *United States v. Calvetti*, 836 F.3d 654, 667-68 (6th Cir. 2016).  The Government presented evidence that Velasquez, Cordero, and King worked together to profit from cocaine that was being shipped to Ohio from Puerto Rico.  In particular, King testified that Velasquez asked for his assistance in rerouting a package and told King that "if we can reroute the stuff that I've got, we'll be rich."  According to King, the plan was, in Velasquez's words, to "burn the supplier" by taking the drugs and telling the supplier that the package never arrived.  This way, Velasquez could sell the drugs without paying for them, thereby making a larger profit.  While Velasquez never used the term "drugs" or specified what was in the package, King testified that it was clear that the package contained narcotics.  King had learned from Cordero that Velasquez was a drug dealer and Velasquez had made comments to King such as "things are slow in the streets," which further suggested Velasquez's involvement in drug trafficking.  In this context, Velasquez's statement that they were going to "get rich" by rerouting a package and "burning the supplier" was obviously referring to drugs.  Sure enough, the tracking number Velasquez provided to King through Cordero was eventually traced by investigators to a package containing one kilogram of cocaine.

Cordero demonstrated both knowledge of and involvement in the scheme.  Cordero received the tracking number from Velasquez and then proceeded to recite the tracking number to King while watching King type in the numbers on a smartphone.  When King was unable to reroute the package, causing it to be sent back to Puerto Rico, Cordero informed King, "don't worry about the package.  Once it gets back to Puerto Rico, they'll retrieve it."  Cordero instructed King to take a screenshot of the post office website showing the package's arrival in Puerto Rico and to send it to Velasquez, along with a message that Cordero dictated.  Significantly, during King and Cordero's recorded conversation, Cordero brought up the status

of the package on his own, asking King, "[y]ou wanna check the post office?" There was also testimony from King that Cordero boasted of his role in delivering a package containing three kilograms of cocaine, which King interpreted to be the package that Velasquez had sought to reroute. Finally, a friend and fellow inmate of Cordero's, Miguel Rosario, testified that Cordero spoke of providing a tracking number to "the kid," i.e., King, in order to reroute a package that contained "a lot of drugs." A rational juror could find from this evidence the existence of a conspiracy between Velasquez and Cordero.

Contrary to defendants' contention, King's status as a government informant did not preclude the possibility of a conspiracy, notwithstanding the fact that much of the evidence consisted of one-on-one conversations between King and each of the defendants. While it is true that a person may not form a conspiracy solely with a government agent, it is settled law that a defendant's conversations with a government agent may be used to establish the existence of a conspiracy between the defendant and other, non-government co-conspirators. *United States v. Deitz*, 577 F.3d 672, 681 (6th Cir. 2009) (collecting cases); *see United States v. Nicholson*, 716 F. App'x 400, 410 n.3 (6th Cir. 2017). King's conversations with Cordero and Velasquez were thus relevant to the extent they shed light on the nature and scope of the conspiracy between Velasquez and Cordero. Moreover, that King might have played a vital role in the conspiracy does not diminish the criminal liability of Cordero and Velasquez as participants in the conspiracy. "The participation of a government agent in a conspiracy does not negate the existence of that conspiracy nor make it any the less a violation of the law." *United States v. Cordero*, 668 F.2d 32, 43 (1st Cir. 1981).

Cordero next argues that, while he may have been aware of and facilitated an agreement between King and Velasquez to distribute cocaine, he never actually reached an agreement with Velasquez. But the agreement requirement is not so exacting. Caselaw makes clear that no formal agreement is necessary, and "[t]he existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *United States v. Salgado*, 250 F.3d 438, 447 (6th Cir. 2001). A rational jury could conclude that Cordero's (1) relaying the tracking number to King, (2) supervision of King's attempts to reroute

the package, and (3) involvement in sending the package's tracking information back to Velasquez constituted participation in Velasquez's plan to reroute the package.

Further, the evidence belies defendants' contention that they did not enter into an agreement to *distribute cocaine* because they did not know what was inside the package. As for Cordero, he was aware that Velasquez was a drug dealer and informed King of as much. Cordero was also likely privy to the conversations between Velasquez and King that included the discussion of "burning the supplier" and getting rich. Based on this evidence, a rational juror could have inferred that Cordero knew that the package Velasquez wanted rerouted contained drugs. On top of this evidence, there was testimony from Rosario that Cordero mentioned using King to reroute a package with "a lot of drugs." Cordero attempts to discount this evidence, pointing out that he spoke with Velasquez's girlfriend on the phone shortly before making this statement to Rosario and thus could have learned about the contents of the package only then. Were this the case, Cordero asserts, his statement to Rosario was not probative of his state of mind during the course of the conspiracy, which ended when Velasquez was arrested four days earlier on July 7th. But nothing in the record indicates that this is more than speculation. Viewed in the light most favorable to the Government, Cordero's statement to Rosario reflected his knowledge while the conspiracy was still in effect.

There was equally strong evidence that Velasquez knew that the package contained drugs. As mentioned, the jury was aware of Velasquez's reputation as a drug dealer. This, combined with Velasquez's statements to King that "they'll be rich" by rerouting "stuff" and "burning the supplier," strongly suggested Velasquez's intent to profit from selling drugs inside the package. Furthermore, the jury could reasonably infer that Cordero's knowledge of the drug scheme—as revealed in his comment to Rosario—was gleaned from Velasquez, whom Cordero trusted and spoke with frequently.

As the Government correctly points out, the defendants' knowledge that the package contained drugs, as opposed to cocaine in particular, was sufficient to establish the mens rea requirement for a conspiracy under 21 U.S.C. § 846. *See United States v. Villarce*, 323 F.3d 435, 439 & n.1 (6th Cir. 2003). Also, the large quantity of drugs in the package allowed the jury to infer the necessary intent to distribute those drugs. *Salgado*, 250 F.3d at 447.

In arguing that they lacked knowledge of the package's contents, defendants mistakenly equate their case with *United States v. Sliwo*, 620 F.3d 630 (6th Cir. 2010). There, this court reversed the defendant's conviction for conspiracy to distribute marijuana because the evidence demonstrated at most that the defendant had knowingly engaged in a scheme "with some sort of criminal purpose," but not one that involved violation of the drug laws. *Id.* at 636. The defendant in *Sliwo* had acted as a lookout while other defendants loaded marijuana onto a truck. *Id.* at 634. There was no evidence that Sliwo had seen the marijuana in the truck or had any discussions with the men who had seen the truck loaded. *Id.* We observed in *Sliwo* that the evidence "fail[ed] to demonstrate that Defendant knew that this conspiracy involved marijuana as opposed to stolen electronic equipment, counterfeit handbags, weapons, or any other illegal object that could be transported in a van." *Id.* at 636. In contrast to *Sliwo*, there is considerable circumstantial evidence linking the defendants not only to illegal activity but to drug trafficking in particular. For one, the evidence established that Velasquez was a drug dealer and that Cordero knew this; there was no evidence that Velasquez trafficked other types of contraband. For another, Cordero made statements to both King and Rosario about trafficking drugs through the mail.

Finally, Cordero's argument that his limited role in the conspiracy was insufficient to meet the participation element also fails. Although Cordero's participation was limited, it was not insignificant. As demonstrated above, Cordero acted as the link between Velasquez and King and closely supervised King's attempt to reroute the package. This evidence demonstrated more than "mere association with conspirators," which we have held insufficient to meet the participation requirement. *United States v. Pearce*, 912 F.2d 159, 162 (6th Cir. 1990). Indeed, the defendant's connection to the conspiracy need only be "slight," where, as here, "there is sufficient evidence to establish that connection beyond a reasonable doubt." *United States v. Hernandez*, 31 F.3d 354, 358 (6th Cir. 1994) (quoting *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986)).

In sum, the evidence was sufficient to convict defendants of conspiring to distribute cocaine under 21 U.S.C. § 846.

## V. Admissibility of Other-Acts Evidence

The trial court did not abuse its discretion in admitting other-acts evidence in this case. The evidence of Cordero's attempt to kill King and of defendants' scheme to distribute K2 was relevant for purposes other than to show character and was probative of material issues in the case. Furthermore, the probative value of this evidence did not outweigh its prejudicial effect.

Cordero's offering Rosario payment for King's murder upon suspecting King's cooperation with the government was admissible under Rule 404(b). We have consistently held that other-acts evidence involving threats or attempted acts of violence by defendants against trial witnesses is admissible to show consciousness of guilt. *See United States v. Fortson*, 194 F.3d 730, 737 (6th Cir. 1999); *United States v. Maddox*, 944 F.2d 1223, 1230 (6th Cir. 1991); *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986); *United States v. Franks*, 511 F.2d 25, 36 (6th Cir. 1975); *see also United States v. Hanson*, 208 F.3d 215, 2000 WL 125863, at *2 (6th Cir. 2000) (unpublished table decision) (per curiam). "Because spoliation evidence tends to establish consciousness of guilt without any inference as to the character of the spoliator, its admission does not violate Rule 404(b)." *Mendez-Ortiz*, 810 F.2d at 79. As we explained in *Mendez-Ortiz*, "[t]he fact that [a] defendant attempted to bribe and threaten an adverse witness indicates 'his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit.'" *Id.* (quoting II Wigmore, Evidence § 278). While King had not yet formally become a trial witness by the time Cordero solicited his murder, it was certainly a likelihood given that Velasquez had already been arrested. Regardless, the Seventh Circuit has observed that threats to suspected informants "fit[] comfortably within the widely recognized principle that a defendant's attempts to intimidate potential witnesses are probative of his consciousness of guilt." *United States v. Mokol*, 646 F.3d 479, 483 (7th Cir. 2011).

The consciousness-of-guilt evidence was furthermore probative of Cordero's intent, knowledge, and lack of mistake, all of which are permissible purposes of other-acts evidence under Rule 404(b). If, as Cordero says, he had no knowledge that the package being rerouted contained cocaine or that Velasquez had been paid to murder Goines, Cordero would not have

felt as compelled to silence King.**3** Moreover, Cordero's efforts to prevent King from divulging what he knew suggested that Cordero did not act unwittingly or with honest intent. Indeed, courts have observed that evidence tending to show consciousness of guilt frequently bears upon a defendant's intent and knowledge. *See United States v. Perez*, 387 F.3d 201, 209 (2d Cir. 2004); *United States v. Esparsen*, 930 F.2d 1461, 1476 n.16 (10th Cir. 1991); *United States v. Gonsalves*, 668 F.2d 73, 75 (1st Cir. 1982).

The issues of intent, knowledge, and absence of mistake were material in this case. In particular, the crime of murder for hire necessitates a showing of "intent that a murder be committed." 18 U.S.C. § 1958(a). The government must similarly demonstrate that a defendant's distribution of cocaine was done "knowingly or intentionally." 21 U.S.C. § 841(a)(1). In addition, to convict a defendant of conspiracy, the government must establish that the defendant knowingly and intentionally joined the conspiracy. *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (citing 18 U.S.C. § 371). While absence of mistake is not an essential element of the crimes charged, Cordero arguably raised the defense at trial by arguing that any attempt to reroute the package was done without the knowledge that it contained cocaine. Cordero also made a similar argument with respect to the murder-for-hire charge, claiming that he assisted Velasquez in obtaining Goines' address while under the impression that Velasquez would merely sell the information. "[A]bsence of mistake is in issue where a defendant admits involvement in a specific event but asserts that he acted unwittingly or with honest intent." *United States v. Sandoval*, 460 F. App'x 552, 564-65 (6th Cir. 2012) (collecting cases). The government may present other-acts evidence when, as here, it helps prove a defendant's "specific criminal intent," where such intent is imposed "either by virtue of the defense raised by the defendant or by virtue of the elements of the crime charged." *United States v. Johnson*, 27 F.3d 1186, 1192 (6th Cir. 1994).

---

**3**In his brief, Velasquez points out that King would have witnessed Cordero commit other, uncharged crimes, thus providing Cordero a reason to silence King that was unrelated to King's knowledge of the charged crimes. Although this is true, it serves only to diminish, rather than extinguish, the relevance of this evidence for demonstrating Cordero's guilty conscience regarding the charged offenses. Velasquez also asserts that Cordero may have sought to kill King out of rage rather than to silence him. Perhaps, but this argument again relates to the *degree* the evidence is relevant, an issue which is more appropriately considered as part of a Rule 403 balancing analysis. *See United States v. Manns*, 277 F. App'x 551, 559 (6th Cir. 2008).

The district court accurately and succinctly conveyed the permissible purposes of the Rule 404(b) evidence when the court instructed the jury that it could consider evidence of defendants' other crimes "only as it relates to the Government's claim on Defendants' intent, knowledge, or absence of mistake." This instruction accordingly passes muster under our caselaw, which holds that a court's instruction on the proper use of Rule 404(b) evidence should be "clear, simple, and correct." *United States v. Davis*, 547 F.3d 520, 527-28 (6th Cir. 2008) (alteration omitted) (quoting *Johnson*, 27 F.3d at 1193).

Finally, the district court did not abuse its discretion when it determined that the other-act evidence was not unfairly prejudicial under Rule 403. We have repeatedly ruled that spoliation evidence is highly probative and not sufficiently inflammatory to warrant exclusion under Rule 403. *See, e.g.*, *United States v. Sutton*, 769 F. App'x 289, 296 (6th Cir. 2019); *Hanson*, 2000 WL 125863, at *2; *Mendez-Ortiz*, 810 F.2d at 79. Defendants do not point to a case holding otherwise. In his brief, Velasquez asserts that the probative value of the spoliation evidence in this case is minimal because King would have witnessed Cordero commit other, uncharged crimes, thus providing Cordero a reason to silence King that was unrelated to King's knowledge of the charged crimes. True enough, but this argument has little force given that the charged crimes in this case (murder for hire and distribution of a kilogram of cocaine) were far more serious than the uncharged crimes (sale of K2 in prison and illegal possession of a cell phone). Velasquez also points out that Cordero may have sought to kill King out of rage rather than in an attempt to silence him. We rejected a similar argument in *United States v. Manns*, 277 F. App'x 551, 559 (6th Cir. 2008), where we noted that "[a] rational factfinder could conclude that the threats [against a witness] constituted evidence of consciousness of guilt rather than revenge for untruthful testimony." Moreover, any prejudice resulting from Rosario's testimony was diminished by the court's legally correct cautionary instructions, which were delivered both at the time the testimony was given and again at the conclusion of trial. The trial court's delivery of consistent, frequent, and accurate limiting instructions weighs against a finding of unfair prejudice. *United States v. Myers*, 123 F.3d 350, 363-64 (6th Cir. 1997).

Also without merit is defendants' challenge to the admission of testimony showing a scheme by Velasquez and Cordero to sell K2 at Fort Dix. The K2 scheme was sufficiently

related and close in time to the cocaine distribution scheme as to be probative of Cordero's knowledge of and intent to join the conspiracy with Velasquez. The K2 evidence also served to rebut Cordero's defense at trial that he was innocently assisting Velasquez in rerouting a package without knowledge that the package contained cocaine.

"This court has repeatedly recognized that prior drug-distribution evidence is admissible under Rule 404(b) to show intent to distribute." *United States v. Hardy*, 643 F.3d 143, 151 (6th Cir. 2011) (internal quotation marks and alteration omitted) (collecting cases). Such evidence is also admissible to show knowledge. *See United States v. Rodriguez*, 882 F.2d 1059, 1064-65 (6th Cir. 1989). That evidence, however, must be sufficiently probative. In *Hardy*, we explained that to be probative of a defendant's present intent to possess and distribute, the evidence of other drug distribution must be "[1] substantially similar and [2] reasonably near in time to the specific intent offense at issue." 643 F.3d at 151 (internal quotation marks omitted) (quoting *United States v. Haywood*, 280 F.3d 715, 721 (6th Cir. 2002)).

As to the second of these requirements, the evidence demonstrated that the K2 scheme was in effect while Cordero assisted Velasquez in rerouting the package. The contemporaneous nature of defendants' two drug schemes strongly enhanced the probative value of the K2 evidence. We have stated that "relative temporal proximity increases a prior act's probative value." *United States v. Asher*, 910 F.3d 854, 861 (6th Cir. 2018). That Cordero was already running a drug distribution operation might well lead a juror to believe that Cordero was a knowing and voluntary participant in a second drug scheme.

With respect to the first requirement, while the uncharged K2 scheme differed in several obvious ways from the charged cocaine scheme, the schemes were related in at least three relevant respects. First, the K2 scheme involved narcotics distribution, as opposed to the purchase and use of narcotics for personal use. *Compare Haywood*, 280 F.3d at 721-22. Second, the schemes involved the same two co-conspirators, a relevant indicator of relatedness. The evidence that Velasquez merely solicited Cordero's assistance in rerouting a package appears much less innocent when considering that Cordero was already conspiring with Velasquez to distribute narcotics. This reasoning finds substantial support in the caselaw. We have on several occasions rejected Rule 404(b) challenges to the admission of other drug dealing

activity where that activity involved individuals identified as co-conspirators or accomplices in the case on trial. *See, e.g.*, *United States v. Wright*, 16 F.3d 1429, 1442-43 (6th Cir. 1994); *United States v. Robison*, 904 F.2d 365, 368 (6th Cir. 1990); *Rodriguez*, 882 F.2d at 1064-65. In *Robison*, for instance, we held that evidence of the defendant's cocaine deals with a co-conspirator five months before the start of the indicted conspiracy was probative of the defendant's intent to distribute cocaine. 904 F.2d at 368.

Furthermore, we have noted the absence of a common accomplice in cases where the prior drug trafficking conduct was deemed unrelated to the charged offense. In *United States v. Bell*, 516 F.3d 432 (6th Cir. 2008), we reversed the defendant's conviction based on the improper admission of uncharged drug trafficking evidence. *Id.* at 444. In doing so, we required that prior drug distributions be "part of the same scheme or involve[] a similar modus operandi as the present offense." *Id.* at 443. We identified *Robison* and *Rodriguez* as meeting that requirement because, in those cases, evidence of the defendant's earlier drug trafficking conduct with a co-conspirator demonstrated present intent to distribute drugs with the same co-conspirator. *Id.* (citing *Robison*, 904 F.2d at 368; *Rodriguez*, 882 F.2d at 1064-65). Although Bell's earlier convictions involved the same type of narcotics charges, the convictions were for offenses that occurred years earlier and were otherwise unconnected to the charges Bell was on trial for. *Id.* at 444. *United States v. Zelinka,* 862 F.2d 92, 99 (6th Cir. 1988), likewise recognized the probative value of other-act evidence involving the same accomplice. In *Zelinka*, we reversed the defendant's drug trafficking conviction, reasoning that evidence of the defendant's involvement in drug distribution sixteen months after the date of the charged offense "was remote from the period of the conspiracy and involved none of the other conspirators." *Id.*

Other circuits have also permitted the admission of prior drug dealing evidence when it involved the same co-conspirator. In *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993), the Second Circuit concluded that "evidence that [the defendant] had previously engaged in narcotics trafficking with [his co-conspirator] is highly probative of [the defendant's] intent to enter another drug conspiracy with the same co-conspirator, and to rebut [the defendant's] defense of innocent association." The First Circuit took a similar stance in *United States v. Rodriguez*, 215 F.3d 110 (1st Cir. 2000). There, the defendants were convicted of conspiring

with a man named Vega to import marijuana by ship. *Id.* at 114. The First Circuit affirmed the district court's admission of testimony from Vega that he and the defendants, including one Santana, had previously sailed large quantities of marijuana and cocaine to the U.S. *Id.* at 115-16, 119. The court reasoned that "[b]y offering evidence of a second incident in which Santana was involved in a completed drug venture with some of the same participants, the government gave the jury a reason to view skeptically Santana's claim that he was just an innocent bystander who was 'merely present,' but rather to conclude that he was a knowing and intentional participant in the crimes charged in the indictment." *Id.* at 119.

Aside from involving distribution of narcotics by the same co-conspirators, the K2 and cocaine schemes were related in that each was conducted from inside prison. Indeed, Cordero faced many of the same hurdles rerouting the drug package as he did coordinating the delivery and sale of K2. Each scheme required communication with Velasquez, who was outside of prison, which had to be done without detection by prison authorities. The evidence showed that Cordero used a hidden cell phone to accomplish this task. Cordero also had significant knowledge of the prison economy, which he relied upon to advance each of the drug schemes at issue. For example, Cordero was able to sell K2 to others in the prison and rented contraband smartphones for King to use in rerouting the cocaine package. Finally, the payment system Cordero and Velasquez had established for the K2 scheme would be equally useful for divvying up the proceeds from the cocaine distribution scheme. In short, Cordero's successful operation of a drug distribution scheme from within prison demonstrated his knowledge and skill to do so again. In the analogous case of *United States v. Gessa*, 971 F.2d 1257, 1262 (6th Cir. 1992) (en banc), we held that testimony describing the defendant's previous use of a boat to import cocaine to Florida from the Bahamas "was probative of 'intent, preparation, or plan,' because the prior excursions were probative of defendant's ability and opportunity to participate in an importation scheme."

To be sure, the cocaine and K2 plots were dissimilar in certain ways. But to be admissible under Rule 404(b), "the prior act need not 'be identical in every detail' to the charged offense." *United States v. Alkufi*, 636 F. App'x 323, 332 (6th Cir. 2016) (quoting *United States v. Perry*, 438 F.3d 642, 648 (6th Cir. 2006)). For instance, we have upheld the admission of

prior acts evidence involving cocaine and hashish despite the fact that the charged offense involved only heroin. *See United States v. Ismail*, 756 F.2d 1253, 1259 (6th Cir. 1985). In the present case, the conspiracies occurred at the same time, included the same co-conspirators, and involved, at least in several important aspects, a similar modus operandi. The district court accordingly did not abuse its discretion when it determined that the K2 evidence was probative of Cordero's knowledge of and intent to join the cocaine distribution conspiracy with Velasquez.

The probative value of the K2 evidence was not substantially outweighed by its prejudicial impact. As discussed, the K2 scheme was ongoing while Cordero worked with Velasquez to reroute the cocaine passage. Accordingly, the concern we have expressed that a defendant is "prejudice[d] . . . for something that happened in the distant past," *Myers*, 123 F.3d at 363, is not present in this case. In addition, under Rule 403, the court may consider whether other means of proof are available aside from the prejudicial other-act evidence. *Id.* While the jury heard evidence of Velasquez's involvement in drug dealing, there was comparatively little evidence linking Cordero to drug trafficking. The K2 evidence was therefore important for the Government's case. Another relevant factor in the Rule 403 balancing analysis is the severity of the uncharged act in comparison to other evidence presented at trial. In *United States v. Maddox*, for instance, we observed that a witness's "mere mention" of one defendant's involvement in an uncharged drug conspiracy was "pretty tame stuff" in comparison to other testimony detailing the defendants' operation of over a dozen crack houses and commission of robbery and other violent gun crimes. 944 F.2d at 1226-28, 1232. Here, the evidence of Cordero's involvement in the sale of synthetic marijuana is far less inflammatory than the evidence presented concerning the murder-for-hire schemes and the distribution of a kilogram of cocaine. Finally, the prejudicial effect of this testimony was lessened by the trial court's cautionary instructions. The court gave a cautionary instruction as soon as the K2 evidence was introduced and gave a substantially similar instruction at the end of trial.

## VI. Severance

The district court did not plainly err in failing to sever the trial in response to testimony about Cordero's scheme to kill King. Velasquez argues that although he was not involved in Cordero's attempt to kill King, he was nevertheless prejudiced by this testimony, and a separate

trial was necessary to avoid that prejudice.  Velasquez did not ask the district court for a separate trial and concedes that plain error review governs this claim on appeal.  "Joint trials are favored in this circuit, and the spillover of evidence from one case to another does not require severance."  *United States v. Dimora*, 750 F.3d 619, 631 (6th Cir. 2014) (internal quotation marks and citations omitted).  Further, juries are presumed to be "capable of sorting out the evidence and considering the case of each defendant separately."  *United States v. Tocco*, 200 F.3d 401, 413 (6th Cir. 2000) (quoting *United States v. Harris*, 9 F.3d 493, 501 (6th Cir. 1993)).  Velasquez provides no basis for why that presumption should not hold in this case, and no such basis appears in the record.  There were only two defendants and two charges, and unlike many cases involving requests for severance, the defendants were charged with the same offenses.  Also, the cases against defendants arose from the same facts, and defendants presented similar defenses at trial.  The district court did not plainly err in trying defendants together.

## VII.  Cordero's Sentence

The district court properly applied § 2E1.4 of the Guidelines in calculating the offense level for Cordero's murder-for-hire conviction.  Section 2E1.4 is the Guideline specifically indexed to the murder-for-hire statute, 18 U.S.C. § 1958.  That Guideline instructs courts to apply a base offense level of 32 or "the offense level applicable to the underlying unlawful conduct," whichever is greater.  U.S.S.G. § 2E1.4(a).  The district court determined that Cordero's underlying conduct was conspiracy to commit murder, and thus rightly referred to the Guideline governing "Conspiracy or Solicitation to Commit Murder," U.S.S.G. § 2A1.5. [R. 116, PageID #2925.]  *See United States v. Temkin*, 797 F.3d 682, 693-94 (9th Cir. 2015).  That Guideline calls for a base offense level of 33, with a four-level increase for when "the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder."  U.S.S.G. § 2A1.5(a), (b)(1).  The district court found the four-level increase appropriate and accordingly assigned Cordero an offense level of 37.

In arguing that the district court wrongly applied the Guidelines, Cordero does not challenge the district court's specific determinations that Cordero's underlying conduct was conspiracy to commit murder or that his conduct involved the offer or the receipt of anything of pecuniary value for undertaking the murder.  Rather, Cordero asserts that

> [b]ecause a conviction of murder for hire already involves the provision or offer of something of pecuniary value, applying a 4 level offense enhancement for that exact same conduct pursuant to USSG §2A1.5 is redundant and improper. It is purporting to "enhance" the base level offense by using the identical conduct that is necessarily contemplated in applying the base offense level of 32 found in USSG §2E1.4.

As Cordero acknowledges, he is swimming upstream with this argument. Although we have not yet weighed in on the question of which Guideline applies in these circumstances, other circuits have unanimously approved the use of U.S.S.G. § 2A1.5(a) for assessing the base offense level of convictions under 18 U.S.C. § 1958. *See United States v. Lisyansky*, 806 F.3d 706, 709-10 (2d Cir. 2015); *Temkin*, 797 F.3d at 694; *United States v. Dotson*, 570 F.3d 1067, 1069 (8th Cir. 2009); *United States v. Vasco*, 564 F.3d 12, 15, 23 (1st Cir. 2009).

Moreover, at least two of these circuits have directly rejected the superfluity argument Cordero raises here. *See Lisyansky*, 806 F.3d at 710; *United States v. Smith*, 755 F.3d 645, 647 (8th Cir. 2014). The reasoning in these opinions is persuasive and aligns with that of our earlier decision in *Ransbottom*. Section 1958 "does not require that the offer have been made or accepted before the statute is violated," *Smith*, 755 F.3d at 647; *accord Ransbottom*, 914 F.2d at 746, nor does it require the formation of a conspiracy, *Lisyansky*, 806 F.3d at 710; *Ransbottom*, 914 F.2d at 746. Accordingly, there will be occasions when the unlawful conduct under § 1958 does not involve conspiracy, solicitation, or the offer or receipt of anything of pecuniary value, in which case the base offense level of 32 in § 2E1.4 would apply. *Lisyansky*, 806 F.3d at 710; *Smith*, 755 F.3d at 647. Applying the plain language in § 2E1.4 thus does not render that Guideline a nullity, as Cordero contends.

## VIII. Velasquez's Sentence

The Government concedes that the district court erred in classifying Velasquez as a career offender. A limited remand is accordingly warranted. To be subject to the heightened penalties as a career offender under the Sentencing Guidelines, the government must show that "(1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony

convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a). The Government contends that the second requirement is not satisfied in this case because Velasquez's current offenses do not qualify as either a "controlled substance offense" or a "crime of violence."

The Government acknowledges that a violation of § 1958 is not a "crime of violence" as used in the Sentencing Guidelines. To be considered a "crime of violence," Velasquez's murder-for-hire conviction must have "as an element the use, attempted use, or threatened use of physical force against the person of another." *See* U.S.S.G. § 4B1.2(a)(1). As discussed, this court has held that § 1958 may be violated when a defendant simply "traveled in interstate commerce with the intent that a contract murder be committed." *Ransbottom*, 914 F.2d at 746. In *Ransbottom*, the defendant violated the statute merely by travelling from Tennessee to Kentucky with the intent to discover the location of the victim. *Id.* at 744, 746. It is therefore apparent under the categorical approach that a violation of § 1958 can occur without the "use, attempted use, or threatened use of physical force" against another person. U.S.S.G. § 4B1.2(a)(1). Other courts have come to the same conclusion with respect to the identical provision in 18 U.S.C. § 924(c)(3)(A). *See United States v. Boman*, 873 F.3d 1035, 1042 (8th Cir. 2017); *Dota v. United States*, 368 F. Supp. 3d 1354, 1361 (C.D. Cal. 2018); *United States v. Herr*, No. 16-cr-10038-IT, 2016 WL 6090714, at *4 (D. Mass. Oct. 18, 2016).

The Government and Velasquez also correctly agree that our decision in *United States v. Havis*, 927 F.3d 382 (6th Cir. 2019) (en banc) (per curiam), invalidated the district court's determination that conspiracy to distribute cocaine qualifies as a "controlled substance offense" under the career offender Guideline. In *Havis*, issued shortly after Velasquez was sentenced, we held that "[t]he Guidelines' definition of 'controlled substance offense' does not include attempt crimes." Id. at 387. The statement to the contrary in the Application Note to § 4B1.2 did not matter: "the Sentencing Commission has no power to add attempt crimes to the list of offenses in § 4B1.2(b) through commentary." *Id.* at 384. "Although the specific facts of *Havis* involved an attempt crime, its reasoning applies with equal force to other inchoate crimes not listed in the text of § 4B1.2(b)." *United States v. Butler*, 812 F. App'x 311, 314 (6th Cir. 2020). Accordingly, we have acknowledged that, in light of *Havis*, conspiracy to distribute controlled

substances is not a "controlled substances offense" under § 4B1.2(b). *See, e.g.*, *United States v. Stephens*, 812 F. App'x 356, 357 (6th Cir. 2020) (mem.) (per curiam) (conspiracy to distribute cocaine); *Butler*, 812 F. App'x at 314-15. We therefore accept the Government's concession that Velasquez was improperly sentenced as a career offender. Velasquez is entitled to resentencing on remand.

In addition to arguing that he was wrongly classified as a career offender, Velasquez takes issue with the district court's calculation of the offense level for his murder-for-hire conviction. Velasquez contends, as did Cordero, that the base offense level of 32 in U.S.S.G. § 2E1.4 applies rather than the base offense level of 33 in U.S.S.G. § 2A1.5. For the reasons provided above with respect to Cordero's sentence, this argument fails.[4] *See* Part VII, *supra*.

Velasquez also asserts that the district court erred by not factoring in the three-level reduction for inchoate crimes under U.S.S.G. § 2X1.1. Section 2X1.1(b)(2) provides,

> If a conspiracy, decrease by 3 levels, unless the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control.

The probation office in its presentence report, which was adopted by the district court, acknowledged that conspiracy to commit murder for hire is covered by § 2X1.1, but reasoned that Velasquez could not benefit from the reduction because "[t]he defendants completed the conspiracy to commit murder for hire when they engaged in a telephone conversation over state lines in which they discussed the murder for hire." The Government does not respond to Velasquez's argument with respect to the three-level reduction in § 2X1.1 and indicated at oral argument that it expects the district court to take up the issue once more on remand. Velasquez, on the other hand, has not addressed the reasons provided by the district court for denying the three-level reduction. In these circumstances, it would be unwise to decide the issue of the three-

---

[4]At the sentencing hearing, Velasquez challenged the district court's imposition of a four-point increase for an offense "involv[ing] the offer or the receipt of anything of pecuniary value for undertaking the murder," U.S.S.G. § 2A1.5(b)(1). He does not raise this issue on appeal.

level reduction, where the legal arguments are not adequately presented. We therefore remand for the district court to consider the issue anew in recalculating Velasquez's offense level.

## IX. Conclusion

For the reasons set forth above, we reverse the judgment of the district court with respect to Velasquez's sentence and remand the case for resentencing. We affirm the judgment of the district court in all other respects.